FERGUSON ET AL. *v.* CITY OF CHARLESTON ET AL.

No. 99–936.   Argued October 4, 2000—Decided March 21, 2001

68

*Priscilla J. Smith* argued the cause for petitioners. With her on the briefs were *Simon Heller, Lynn Paltrow, Susan Frietsche, David S. Cohen, Susan Dunn, David Rudovsky,* and *Seth Kreimer.*

*Robert H. Hood* argued the cause for respondents. With him on the brief were *Barbara Wynne Showers* and *Mary Agnes Hood Craig.**

JUSTICE STEVENS delivered the opinion of the Court.

In this case, we must decide whether a state hospital's performance of a diagnostic test to obtain evidence of a patient's criminal conduct for law enforcement purposes is an

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Julie E. Sternberg, Steven R. Shapiro, Sara L. Mandelbaum, Catherine Weiss, Louise Melling, Louis M. Bograd, Martha F. Davis, Yolanda S. Wu,* and *Roslyn Powell;* for the American Medical Association by *Michael Ile, Anne Murphy,* and *Leonard Nelson;* for the American Public Health Association et al. by *Daniel N. Abrahamson* and *David T. Goldberg;* for the NARAL Foundation et al. by *Nancy L. Perkins* and *Jodi Michael;* for the National Coalition for Child Protection Reform et al. by *Carolyn A. Kubitschek;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

unreasonable search if the patient has not consented to the procedure. More narrowly, the question is whether the interest in using the threat of criminal sanctions to deter pregnant women from using cocaine can justify a departure from the general rule that an official nonconsensual search is unconstitutional if not authorized by a valid warrant.

I

In the fall of 1988, staff members at the public hospital operated in the city of Charleston by the Medical University of South Carolina (MUSC) became concerned about an apparent increase in the use of cocaine by patients who were receiving prenatal treatment.[1] In response to this perceived increase, as of April 1989, MUSC began to order drug screens to be performed on urine samples from maternity patients who were suspected of using cocaine. If a patient tested positive, she was then referred by MUSC staff to the county substance abuse commission for counseling and treatment. However, despite the referrals, the incidence of cocaine use among the patients at MUSC did not appear to change.

Some four months later, Nurse Shirley Brown, the case manager for the MUSC obstetrics department, heard a news broadcast reporting that the police in Greenville, South Carolina, were arresting pregnant users of cocaine on the theory that such use harmed the fetus and was therefore child abuse.[2] Nurse Brown discussed the story with MUSC's general counsel, Joseph C. Good, Jr., who then contacted

---

[1] As several witnesses testified at trial, the problem of "crack babies" was widely perceived in the late 1980's as a national epidemic, prompting considerable concern both in the medical community and among the general populace.

[2] Under South Carolina law, a viable fetus has historically been regarded as a person; in 1995, the South Carolina Supreme Court held that the ingestion of cocaine during the third trimester of pregnancy constitutes criminal child neglect. *Whitner* v. *South Carolina*, 328 S. C. 1, 492 S. E. 2d 777 (1995), cert. denied, 523 U. S. 1145 (1998).

Charleston Solicitor Charles Condon in order to offer MUSC's cooperation in prosecuting mothers whose children tested positive for drugs at birth.[3]

After receiving Good's letter, Solicitor Condon took the first steps in developing the policy at issue in this case. He organized the initial meetings, decided who would participate, and issued the invitations, in which he described his plan to prosecute women who tested positive for cocaine while pregnant. The task force that Condon formed included representatives of MUSC, the police, the County Substance Abuse Commission and the Department of Social Services. Their deliberations led to MUSC's adoption of a 12-page document entitled "POLICY M-7," dealing with the subject of "Management of Drug Abuse During Pregnancy." App. to Pet. for Cert. A-53.

The first three pages of Policy M-7 set forth the procedure to be followed by the hospital staff to "identify/assist pregnant patients suspected of drug abuse." *Id.*, at A-53 to A-56. The first section, entitled the "Identification of Drug Abusers," provided that a patient should be tested for cocaine through a urine drug screen if she met one or more of nine criteria.[4] It also stated that a chain of custody should

---

[3] In his letter dated August 23, 1989, Good wrote: "Please advise us if your office is anticipating future criminal action and what if anything our Medical Center needs to do to assist you in this matter." App. to Pet. for Cert. A-67.

[4] Those criteria were as follows:

"1. No prenatal care

"2. Late prenatal care after 24 weeks gestation

"3. Incomplete prenatal care

"4. Abruptio placentae

"5. Intrauterine fetal death

"6. Preterm labor 'of no obvious cause'

"7. IUGR [intrauterine growth retardation] 'of no obvious cause'

"8. Previously known drug or alcohol abuse

"9. Unexplained congenital anomalies." *Id.*, at A-53 to A-54.

be followed when obtaining and testing urine samples, presumably to make sure that the results could be used in subsequent criminal proceedings. The policy also provided for education and referral to a substance abuse clinic for patients who tested positive. Most important, it added the threat of law enforcement intervention that "provided the necessary 'leverage' to make the [p]olicy effective." Brief for Respondents 8. That threat was, as respondents candidly acknowledge, essential to the program's success in getting women into treatment and keeping them there.

The threat of law enforcement involvement was set forth in two protocols, the first dealing with the identification of drug use during pregnancy, and the second with identification of drug use after labor. Under the latter protocol, the police were to be notified without delay and the patient promptly arrested. Under the former, after the initial positive drug test, the police were to be notified (and the patient arrested) only if the patient tested positive for cocaine a second time or if she missed an appointment with a substance abuse counselor.[5] In 1990, however, the policy was modified at the behest of the solicitor's office to give the patient who tested positive during labor, like the patient who tested positive during a prenatal care visit, an opportunity to avoid arrest by consenting to substance abuse treatment.

The last six pages of the policy contained forms for the patients to sign, as well as procedures for the police to follow when a patient was arrested. The policy also prescribed in detail the precise offenses with which a woman could be charged, depending on the stage of her pregnancy. If the pregnancy was 27 weeks or less, the patient was to be charged with simple possession. If it was 28 weeks or more, she was to be charged with possession and distribution to a person under the age of 18—in this case, the fetus. If she

---

[5] Despite the conditional description of the first category, when the policy was in its initial stages, a positive test was immediately reported to the police, who then promptly arrested the patient.

delivered "while testing positive for illegal drugs," she was also to be charged with unlawful neglect of a child. App. to Pet. for Cert. A–62. Under the policy, the police were instructed to interrogate the arrestee in order "to ascertain the identity of the subject who provided illegal drugs to the suspect." *Id.*, at A–63. Other than the provisions describing the substance abuse treatment to be offered to women who tested positive, the policy made no mention of any change in the prenatal care of such patients, nor did it prescribe any special treatment for the newborns.

## II

Petitioners are 10 women who received obstetrical care at MUSC and who were arrested after testing positive for cocaine. Four of them were arrested during the initial implementation of the policy; they were not offered the opportunity to receive drug treatment as an alternative to arrest. The others were arrested after the policy was modified in 1990; they either failed to comply with the terms of the drug treatment program or tested positive for a second time. Respondents include the city of Charleston, law enforcement officials who helped develop and enforce the policy, and representatives of MUSC.

Petitioners' complaint challenged the validity of the policy under various theories, including the claim that warrantless and nonconsensual drug tests conducted for criminal investigatory purposes were unconstitutional searches. Respondents advanced two principal defenses to the constitutional claim: (1) that, as a matter of fact, petitioners had consented to the searches; and (2) that, as a matter of law, the searches were reasonable, even absent consent, because they were justified by special non-law-enforcement purposes. The District Court rejected the second defense because the searches in question "were not done by the medical university for independent purposes. [Instead,] the police came in and there was an agreement reached that the positive

screens would be shared with the police." App. 1248–1249. Accordingly, the District Court submitted the factual defense to the jury with instructions that required a verdict in favor of petitioners unless the jury found consent.[6] The jury found for respondents.

Petitioners appealed, arguing that the evidence was not sufficient to support the jury's consent finding. The Court of Appeals for the Fourth Circuit affirmed, but without reaching the question of consent. 186 F. 3d 469 (1999). Disagreeing with the District Court, the majority of the appellate panel held that the searches were reasonable as a matter of law under our line of cases recognizing that "special needs" may, in certain exceptional circumstances, justify a search policy designed to serve non-law-enforcement ends.[7]

---

[6] The instructions read: "THERE WERE NO SEARCH WARRANTS ISSUED BY A MAGISTRATE OR ANY OTHER PROPER JUDICIAL OFFICER TO PERMIT THESE URINE SCREENS TO BE TAKEN. THERE NOT BEING A WARRANT ISSUED, THEY ARE UNREASONABLE AND IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES, UNLESS THE DEFENDANTS HAVE SHOWN BY THE GREATER WEIGHT OR PREPONDERANCE OF THE EVIDENCE THAT THE PLAINTIFFS CONSENTED TO THOSE SEARCHES." App. 1314–1315. Under the judge's instructions, in order to find that the plaintiffs had consented to the searches, it was necessary for the jury to find that they had consented to the taking of the samples, to the testing for evidence of cocaine, and to the possible disclosure of the test results to the police. Respondents have not argued, as JUSTICE SCALIA does, that it is permissible for members of the staff of a public hospital to use diagnostic tests "deceivingly" to obtain incriminating evidence from their patients. See post, at 94 (dissenting opinion).

[7] The term "special needs" first appeared in Justice Blackmun's opinion concurring in the judgment in New Jersey v. T. L. O., 469 U. S. 325, 351 (1985). In his concurrence, Justice Blackmun agreed with the Court that there are limited exceptions to the probable-cause requirement, in which reasonableness is determined by "a careful balancing of governmental and private interests," but concluded that such a test should only be applied "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable . . . ." Ibid. This Court subsequently

On the understanding "that MUSC personnel conducted the urine drug screens for medical purposes wholly independent of an intent to aid law enforcement efforts,"[8] *id.*, at 477, the majority applied the balancing test used in *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989), and *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995), and concluded that the interest in curtailing the pregnancy complications and medical costs associated with maternal cocaine use outweighed what the majority termed a minimal intrusion on the privacy of the patients. In dissent, Judge Blake concluded that the "special needs" doctrine should not apply and

adopted the "special needs" terminology in *O'Connor* v. *Ortega*, 480 U. S. 709, 720 (1987) (plurality opinion), and *Griffin* v. *Wisconsin*, 483 U. S. 868, 873 (1987), concluding that, in limited circumstances, a search unsupported by either warrant or probable cause can be constitutional when "special needs" other than the normal need for law enforcement provide sufficient justification. See also *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 652–653 (1995).

[8] The majority stated that the District Court had made such a finding. 186 F. 3d, at 477. The text of the relevant finding, made in the context of petitioners' now abandoned Title VI claim, reads as follows: "The policy was applied in all maternity departments at MUSC. Its goal was not to arrest patients but to facilitate their treatment and protect both the mother and unborn child." App. to Pet. for Cert. A–38. That finding, however, must be read in light of this comment by the District Court with respect to the Fourth Amendment claim:

". . . THESE SEARCHES WERE NOT DONE BY THE MEDICAL UNIVERSITY FOR INDEPENDENT PURPOSES. IF THEY HAD BEEN, THEN THEY WOULD NOT IMPLICATE THE FOURTH AMENDMENT. OBVIOUSLY AS I POINT OUT THERE ON PAGE 4, NORMALLY URINE SCREENS AND BLOOD TESTS AND THAT TYPE OF THING CAN BE TAKEN BY HEALTH CARE PROVIDERS WITHOUT HAVING TO WORRY ABOUT THE FOURTH AMENDMENT. THE ONLY REASON THE FOURTH AMENDMENT IS IMPLICATED HERE IS THAT THE POLICE CAME IN AND THERE WAS AN AGREEMENT REACHED THAT THE POSITIVE SCREENS WOULD BE SHARED WITH THE POLICE. AND THEN THE SCREEN IS NOT DONE INDEPENDENT OF POLICE, IT'S DONE IN CONJUNCTION WITH THE POLICE AND THAT IMPLICATES THE FOURTH AMENDMENT." App. 1248–1249.

that the evidence of consent was insufficient to sustain the jury's verdict. 186 F. 3d, at 487–488.

We granted certiorari, 528 U. S. 1187 (2000), to review the appellate court's holding on the "special needs" issue. Because we do not reach the question of the sufficiency of the evidence with respect to consent, we necessarily assume for purposes of our decision—as did the Court of Appeals—that the searches were conducted without the informed consent of the patients. We conclude that the judgment should be reversed and the case remanded for a decision on the consent issue.

## III

Because MUSC is a state hospital, the members of its staff are government actors, subject to the strictures of the Fourth Amendment. *New Jersey* v. *T. L. O.*, 469 U. S. 325, 335–337 (1985). Moreover, the urine tests conducted by those staff members were indisputably searches within the meaning of the Fourth Amendment. *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 617 (1989).[9]  Neither the District Court nor the Court of Appeals concluded that any of the nine criteria used to identify the women to be searched provided either probable cause to believe that they were using cocaine, or even the basis for a reasonable suspicion of such use. Rather, the District Court and the Court of Appeals viewed the case as one involving MUSC's right

---

[9] In arguing that the urine tests at issue were not searches, the dissent attempts to disaggregate the taking and testing of the urine sample from the reporting of the results to the police. See *post*, at 92. However, in our special needs cases, we have routinely treated urine screens taken by state agents as searches within the meaning of the Fourth Amendment even though the results were not reported to the police, see, *e. g., Chandler* v. *Miller*, 520 U. S. 305 (1997); *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995); *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 617 (1989); *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989), and respondents here do not contend that the tests were not searches. Rather, they argue that the searches were justified by consent and/or by special needs.

to conduct searches without warrants or probable cause.[10] Furthermore, given the posture in which the case comes to us, we must assume for purposes of our decision that the tests were performed without the informed consent of the patients.[11]

Because the hospital seeks to justify its authority to conduct drug tests and to turn the results over to law enforcement agents without the knowledge or consent of the patients, this case differs from the four previous cases in which we have considered whether comparable drug tests "fit within the closely guarded category of constitutionally permissible suspicionless searches." *Chandler* v. *Miller*, 520 U. S. 305, 309 (1997). In three of those cases, we sustained drug tests for railway employees involved in train accidents, *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602 (1989), for United States Customs Service employees seeking promotion to certain sensitive positions, *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989), and for high school students participating in interscholastic sports, *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995). In the fourth case, we struck down such testing for candidates for designated state offices as unreasonable. *Chandler* v. *Miller*, 520 U. S. 305 (1997).

---

[10] In a footnote to their brief, respondents do argue that the searches were not entirely suspicionless. Brief for Respondents 23, n. 13. They do not, however, point to any evidence in the record indicating that any of the nine search criteria was more apt to be caused by cocaine use than by some other factor, such as malnutrition, illness, or indigency. More significantly, their legal argument and the reasoning of the majority panel opinion rest on the premise that the policy would be valid even if the tests were conducted randomly.

[11] The dissent would have us do otherwise and resolve the issue of consent in favor of respondents. Because the Court of Appeals did not discuss this issue, we think it more prudent to allow that court to resolve the legal and factual issues in the first instance, and we express no view on those issues. See, *e. g., Glover* v. *United States*, 531 U. S. 198 (2001); *National Collegiate Athletic Assn.* v. *Smith*, 525 U. S. 459, 470 (1999).

In each of those cases, we employed a balancing test that weighed the intrusion on the individual's interest in privacy against the "special needs" that supported the program. As an initial matter, we note that the invasion of privacy in this case is far more substantial than in those cases. In the previous four cases, there was no misunderstanding about the purpose of the test or the potential use of the test results, and there were protections against the dissemination of the results to third parties.[12] The use of an adverse test result to disqualify one from eligibility for a particular benefit, such as a promotion or an opportunity to participate in an extra-curricular activity, involves a less serious intrusion on privacy than the unauthorized dissemination of such results to third parties. The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent. See Brief for American Medical Association as *Amicus Curiae* 11; Brief for American Public Health Association et al. as *Amici Curiae* 6, 17–19.[13] In none of our prior cases was there any intrusion upon that kind of expectation.[14]

---

[12] *Chandler,* 520 U. S., at 312, 318; *Acton,* 515 U. S., at 658; *Skinner,* 489 U. S., at 621, n. 5, 622, n. 6; *Von Raab,* 489 U. S., at 663, 666–667, 672, n. 2.

[13] There are some circumstances in which state hospital employees, like other citizens, may have a duty to provide law enforcement officials with evidence of criminal conduct acquired in the course of routine treatment, see, *e. g.,* S. C. Code Ann. §20–7–510 (2000) (physicians and nurses required to report to child welfare agency or law enforcement authority "when in the person's professional capacity the person" receives information that a child has been abused or neglected). While the existence of such laws might lead a patient to expect that members of the hospital staff might turn over evidence acquired in the course of treatment to which the patient had consented, they surely would not lead a patient to anticipate that hospital staff would intentionally set out to obtain incriminating evidence from their patients for law enforcement purposes.

[14] In fact, we have previously recognized that an intrusion on that expectation may have adverse consequences because it may deter patients from

The critical difference between those four drug-testing cases and this one, however, lies in the nature of the "special need" asserted as justification for the warrantless searches. In each of those earlier cases, the "special need" that was advanced as a justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement.[15] This point was em-

---

receiving needed medical care. *Whalen* v. *Roe*, 429 U. S. 589, 599–600 (1977). Cf. Poland, Dombrowski, Ager, & Sokol, Punishing pregnant drug users: enhancing the flight from care, 31 Drug and Alcohol Dependence 199–203 (1993).

[15] As THE CHIEF JUSTICE recently noted: "The 'special needs' doctrine, which has been used to uphold certain suspicionless searches performed for reasons unrelated to law enforcement, is an exception to the general rule that a search must be based on individualized suspicion of wrongdoing." *Indianapolis* v. *Edmond*, 531 U. S. 32, 54 (2000) (dissenting opinion); see also nn. 16–17, *infra*. In *T. L. O.*, we made a point of distinguishing searches "carried out by school authorities acting alone and on their own authority" from those conducted "in conjunction with or at the behest of law enforcement agencies." 469 U. S., at 341, n. 7.

The dissent, however, relying on *Griffin* v. *Wisconsin*, 483 U. S. 868 (1987), argues that the special needs doctrine "is ordinarily employe[d], precisely to enable searches *by law enforcement officials* who, of course, ordinarily have a law enforcement objective." *Post*, at 100. Viewed in the context of our special needs case law and even viewed in isolation, *Griffin* does not support the proposition for which the dissent invokes it. In other special needs cases, we have tolerated suspension of the Fourth Amendment's warrant or probable-cause requirement in part because there was no law enforcement purpose behind the searches in those cases, and there was little, if any, entanglement with law enforcement. See *Skinner*, 489 U. S., at 620–621; *Von Raab*, 489 U. S., at 665–666; *Acton*, 515 U. S., at 658. Moreover, *after* our decision in *Griffin*, we reserved the question whether "routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the . . . program." *Skinner*, 489 U. S., at 621, n. 5. In *Griffin* itself, this Court noted that "[a]lthough a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen." 483 U. S., at 876. Finally, we agree with petitioners

phasized both in the majority opinions sustaining the programs in the first three cases,[16] as well as in the dissent in the *Chandler* case.[17] In this case, however, the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment. This fact distinguishes this case from circumstances in which physicians or psychologists, in the

---

that *Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large. *Id.*, at 874–875.

[16] In *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602 (1989), this Court noted that "[t]he FRA has prescribed toxicological tests, not to assist in the prosecution of employees, but rather 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.'" *Id.*, at 620–621 (quoting 49 CFR § 219.1(a) (1987)). Similarly, in *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989), we concluded that it was "clear that the Customs Service's drug-testing program is not designed to serve the ordinary needs of law enforcement. Test results may not be used in a criminal prosecution of the employee without the employee's consent." *Id.*, at 665–666. In the same vein, in *Acton*, 515 U. S., at 658, we relied in part on the fact that "the results of the tests are disclosed only to a limited class of school personnel who have a need to know; and they are not turned over to law enforcement authorities or used for any internal disciplinary function" in finding the searches reasonable.

[17] "Today's opinion speaks of a 'closely guarded' class of permissible suspicionless searches which must be justified by a 'special need.' But this term, as used in *Skinner* and *Von Raab* and on which the Court now relies, was used in a quite different sense than it is used by the Court today. In *Skinner* and *Von Raab* it was used to describe a basis for a search apart from the regular needs of law enforcement, *Skinner*, [489 U. S.], at 620; *Von Raab*, [489 U. S.], at 669. The 'special needs' inquiry as delineated there has not required especially great 'importan[ce],' [520 U. S.], at 318, unless one considers 'the supervision of probationers,' or the 'operation of a government office,' *Skinner*, *supra*, at 620, to be especially 'important.' Under our precedents, if there was a proper governmental purpose other than law enforcement, there was a 'special need,' and the Fourth Amendment then required the familiar balancing between that interest and the individual's privacy interest." *Chandler* v. *Miller*, 520 U. S., at 325 (REHNQUIST, C. J., dissenting).

course of ordinary medical procedures aimed at helping the patient herself, come across information that under rules of law or ethics is subject to reporting requirements, which no one has challenged here. See, *e. g.,* Council on Ethical and Judicial Affairs, American Medical Association, Policy-Finder, Current Opinions E–5.05 (2000) (requiring reporting where "a patient threatens to inflict serious bodily harm to another person or to him or herself and there is a reasonable probability that the patient may carry out the threat"); Ark. Code Ann. § 12–12–602 (1999) (requiring reporting of intentionally inflicted knife or gunshot wounds); Ariz. Rev. Stat. Ann. § 13–3620 (Supp. 2000) (requiring "any . . . person having responsibility for the care or treatment of children" to report suspected abuse or neglect to a peace officer or child protection agency).[18]

Respondents argue in essence that their ultimate purpose—namely, protecting the health of both mother and child—is a beneficent one. In *Chandler,* however, we did not simply accept the State's invocation of a "special need." Instead, we carried out a "close review" of the scheme at issue before concluding that the need in question was not "special," as that term has been defined in our cases. 520 U. S., at 322. In this case, a review of the M–7 policy plainly reveals that the purpose actually served by the MUSC searches "is ultimately indistinguishable from the general interest in crime control." *Indianapolis* v. *Edmond,* 531 U. S. 32, 44 (2000).

In looking to the programmatic purpose, we consider all the available evidence in order to determine the relevant primary purpose. See, *e. g., id.,* at 45–47. In this case, as

_____

[18] Our emphasis on this distinction should make it clear that, contrary to the hyperbole in the dissent, we do not view these reporting requirements as "clearly bad." See *post,* at 95–96, n. 3. Those requirements are simply not in issue here.

Judge Blake put it in her dissent below, "it . . . is clear from the record that an initial and continuing focus of the policy was on the arrest and prosecution of drug-abusing mothers . . . ." 186 F. 3d, at 484. Tellingly, the document codifying the policy incorporates the police's operational guidelines. It devotes its attention to the chain of custody, the range of possible criminal charges, and the logistics of police notification and arrests. Nowhere, however, does the document discuss different courses of medical treatment for either mother or infant, aside from treatment for the mother's addiction.

Moreover, throughout the development and application of the policy, the Charleston prosecutors and police were extensively involved in the day-to-day administration of the policy. Police and prosecutors decided who would receive the reports of positive drug screens and what information would be included with those reports. App. 78–80, 145–146, 1058–1060. Law enforcement officials also helped determine the procedures to be followed when performing the screens.[19] *Id.*, at 1052–1053. See also *id.*, at 26–27, 945. In the course of the policy's administration, they had access to Nurse Brown's medical files on the women who tested positive, routinely attended the substance abuse team's meetings, and regularly received copies of team documents discussing the women's progress. *Id.*, at 122–124, 609–610. Police took pains to coordinate the timing and circumstances of the arrests with MUSC staff, and, in particular, Nurse Brown. *Id.*, at 1057–1058.

While the ultimate goal of the program may well have been to get the women in question into substance abuse treatment

---

[19] Accordingly, the police organized a meeting with the staff of the police and hospital laboratory staffs, as well as Nurse Brown, in which the police went over the concept of a chain of custody system with the MUSC staff. App. 1052–1053.

and off of drugs, the immediate objective of the searches was to generate evidence *for law enforcement purposes*[20] in order to reach that goal.[21]  The threat of law enforcement

[20] We italicize those words lest our reasoning be misunderstood.  See *post*, at 86–88 (KENNEDY, J., concurring in judgment).  In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes.  Our essential point is the same as JUSTICE KENNEDY's—the extensive entanglement of law enforcement cannot be justified by reference to legitimate needs.

According to the dissent, the fact that MUSC performed tests prior to the development of Policy M–7 should immunize any subsequent testing policy despite the presence of a law enforcement purpose and extensive law enforcement involvement.  See *post*, at 98–100.  To say that any therapeutic purpose did not disappear is simply to miss the point.  What matters is that under the new policy developed by the solicitor's office and MUSC, law enforcement involvement was the means by which that therapeutic purpose was to be met.  Policy M–7 was, at its core, predicated on the use of law enforcement.  The extensive involvement of law enforcement and the threat of prosecution were, as respondents admitted, essential to the program's success.

[21] Accordingly, this case differs from *New York* v. *Burger*, 482 U. S. 691 (1987), in which the Court upheld a scheme in which police officers were used to carry out administrative inspections of vehicle dismantling businesses.  That case involved an industry in which the expectation of privacy in commercial premises was "particularly attenuated" given the extent to which the industry in question was closely regulated.  *Id.*, at 700.  More important for our purposes, the Court relied on the "plain administrative purposes" of the scheme to reject the contention that the statute was in fact "designed to gather evidence to enable convictions under the penal laws . . . ."  *Id.*, at 715.  The discovery of evidence of other violations would have been merely incidental to the purposes of the administrative search.  In contrast, in this case, the policy was specifically designed to gather evidence of violations of penal laws.

This case also differs from the handful of seizure cases in which we have applied a balancing test to determine Fourth Amendment reasonableness.  See, *e. g.*, *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444, 455 (1990); *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976).  First, those cases involved roadblock seizures, rather than "the intrusive search of the body or the home."  See *Indianapolis* v. *Edmond*, 531 U. S., at 54–55 (REHNQUIST, C. J., dissenting); *Martinez-Fuerte*, 428 U. S., at 561 ("[W]e deal

may ultimately have been intended as a means to an end, but the direct and primary purpose of MUSC's policy was to ensure the use of those means. In our opinion, this distinction is critical. Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose.[22] Such an approach is inconsistent with the Fourth Amendment. Given the primary purpose of the Charleston program, which was to use the threat of arrest and prosecution in order to force women into treatment, and given the extensive involvement of law enforcement officials at every stage of the policy, this case simply does not fit within the closely guarded category of "special needs."[23]

The fact that positive test results were turned over to the police does not merely provide a basis for distinguishing our prior cases applying the "special needs" balancing approach to the determination of drug use. It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment. While state hospital employees, like other citizens, may have a duty to provide the police with evidence

neither with searches nor with the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection"). Second, the Court explicitly distinguished the cases dealing with checkpoints from those dealing with "special needs." *Sitz*, 496 U. S., at 450.

[22] Thus, under respondents' approach, any search to generate evidence for use by the police in enforcing general criminal laws would be justified by reference to the broad social benefits that those laws might bring about (or, put another way, the social harms that they might prevent).

[23] It is especially difficult to argue that the program here was designed simply to save lives. *Amici* claim a near consensus in the medical community that programs of the sort at issue, by discouraging women who use drugs from seeking prenatal care, harm, rather than advance, the cause of prenatal health. See Brief for American Medical Association as *Amicus Curiae* 6–22; Brief for American Public Health Association et al. as *Amici Curiae* 17–21; Brief for NARAL Foundation et al. as *Amici Curiae* 18–19.

of criminal conduct that they inadvertently acquire in the course of routine treatment, when they undertake to obtain such evidence from their patients *for the specific purpose of incriminating those patients,* they have a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require.[24]   Cf. *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

As respondents have repeatedly insisted, their motive was benign rather than punitive.   Such a motive, however, cannot justify a departure from Fourth Amendment protections, given the pervasive involvement of law enforcement with the development and application of the MUSC policy.   The stark

---

[24] In fact, some MUSC staff made this distinction themselves.   See Pl. Exh. No. 14, Hulsey, 11–17–89, Coke Committee, 1–2 ("The use of medically indicated tests for substance abuse, obtained in conventional manners, must be distinguished from mandatory screening and collection of evidence using such methods as chain of custody, etc. . . . The question is raised as to whether pediatricians should function as law enforcement officials.   While the reporting of criminal activity to appropriate authorities may be required and/or ethically just, the active pursuit of evidence to be used against individuals presenting for medical care may not be proper").

The dissent, however, mischaracterizes our opinion as holding that "material which a person voluntarily entrusts to someone else cannot be given by that person to the police, and used for whatever evidence it may contain." *Post,* at 95.   But, as we have noted elsewhere, given the posture of the case, we must assume for purposes of decision that the patients did *not* consent to the searches, and we leave the question of consent for the Court of Appeals to determine.   See n. 11, *supra.*

The dissent further argues that our holding "leaves law enforcement officials entirely in the dark as to when they can use incriminating evidence obtained from 'trusted' sources." See *post,* at 95.   With all due respect, we disagree.   We do not address a case in which doctors independently complied with reporting requirements.   Rather, as we point out above, in this case, medical personnel used the criteria set out in n. 4, *supra,* to collect evidence for law enforcement purposes, and law enforcement officers were extensively involved in the initiation, design, and implementation of the program.   In such circumstances, the Fourth Amendment's general prohibition against nonconsensual, warrantless, and suspicionless searches applies in the absence of consent.   We decline to accept the dissent's invitation to make a foray into dicta and address other situations not before us.

and unique fact that characterizes this case is that Policy M–7 was designed to obtain evidence of criminal conduct by the tested patients that would be turned over to the police and that could be admissible in subsequent criminal prosecutions. While respondents are correct that drug abuse both was and is a serious problem, "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *Indianapolis* v. *Edmond,* 531 U. S., at 42–43. The Fourth Amendment's general prohibition against nonconsensual, warrantless, and suspicionless searches necessarily applies to such a policy. See, *e. g., Chandler,* 520 U. S., at 308; *Skinner,* 489 U. S., at 619.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, concurring in the judgment.

I agree that the search procedure in issue cannot be sustained under the Fourth Amendment. My reasons for this conclusion differ somewhat from those set forth by the Court, however, leading to this separate opinion.

I

The Court does not dispute that the search policy at some level serves special needs, beyond those of ordinary law enforcement, such as the need to protect the health of mother and child when a pregnant mother uses cocaine. Instead, the majority characterizes these special needs as the "ultimate goal[s]" of the policy, as distinguished from the policy's "immediate purpose," the collection of evidence of drug use, which, the Court reasons, is the appropriate inquiry for the special needs analysis. *Ante,* at 81–84.

The majority views its distinction between the ultimate goal and immediate purpose of the policy as critical to its

analysis. *Ante,* at 83–84. The distinction the Court makes, however, lacks foundation in our special needs cases. All of our special needs cases have turned upon what the majority terms the policy's ultimate goal. For example, in *Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602 (1989), had we employed the majority's distinction, we would have identified as the relevant need the collection of evidence of drug and alcohol use by railway employees. Instead, we identified the relevant need as "[t]he Government's interest in regulating the conduct of railroad employees to ensure [railroad] safety." *Id.,* at 620. In *Treasury Employees* v. *Von Raab,* 489 U. S. 656 (1989), the majority's distinction should have compelled us to isolate the relevant need as the gathering of evidence of drug abuse by would-be drug interdiction officers. Instead, the special needs the Court identified were the necessities "to deter drug use among those eligible for promotion to sensitive positions within the [United States Customs] Service and to prevent the promotion of drug users to those positions." *Id.,* at 666. In *Vernonia School Dist. 47J* v. *Acton,* 515 U. S. 646 (1995), the majority's distinction would have required us to identify the immediate purpose of gathering evidence of drug use by student-athletes as the relevant "need" for purposes of the special needs analysis. Instead, we sustained the policy as furthering what today's majority would have termed the policy's ultimate goal: "[d]eterring drug use by our Nation's schoolchildren," and particularly by student-athletes, because "the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." *Id.,* at 661–662.

It is unsurprising that in our prior cases we have concentrated on what the majority terms a policy's ultimate goal, rather than its proximate purpose. By very definition, in almost every case the immediate purpose of a search policy will be to obtain evidence. The circumstance that a particular search, like all searches, is designed to collect evidence

of some sort reveals nothing about the need it serves. Put a different way, although procuring evidence is the immediate result of a successful search, until today that procurement has not been identified as the special need which justifies the search.

## II

While the majority's reasoning seems incorrect in the respects just discussed, I agree with the Court that the search policy cannot be sustained. As the majority demonstrates and well explains, there was substantial law enforcement involvement in the policy from its inception. None of our special needs precedents has sanctioned the routine inclusion of law enforcement, both in the design of the policy and in using arrests, either threatened or real, to implement the system designed for the special needs objectives. The special needs cases we have decided do not sustain the active use of law enforcement, including arrest and prosecutions, as an integral part of a program which seeks to achieve legitimate, civil objectives. The traditional warrant and probable-cause requirements are waived in our previous cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes. Most of those tested for drug use under the policy at issue here were not brought into direct contact with law enforcement. This does not change the fact, however, that, as a systemic matter, law enforcement was a part of the implementation of the search policy in each of its applications. Every individual who tested positive was given a letter explaining the policy not from the hospital but from the solicitor's office. Everyone who tested positive was told a second positive test or failure to undergo substance abuse treatment would result in arrest and prosecution. As the Court holds, the hospital acted, in some respects, as an institutional arm of law enforcement for purposes of the policy. Under these circumstances, while the policy may well have served legitimate needs unrelated to law enforcement, it had

as well a penal character with a far greater connection to law enforcement than other searches sustained under our special needs rationale.

In my view, it is necessary and prudent to be explicit in explaining the limitations of today's decision. The beginning point ought to be to acknowledge the legitimacy of the State's interest in fetal life and of the grave risk to the life and health of the fetus, and later the child, caused by cocaine ingestion. Infants whose mothers abuse cocaine during pregnancy are born with a wide variety of physical and neurological abnormalities. See Chiriboga, Brust, Bateman, & Hauser, Dose-Response Effect of Fetal Cocaine Exposure on Newborn Neurologic Function, 103 Pediatrics 79 (1999) (finding that, compared with unexposed infants, cocaine-exposed infants experienced higher rates of intrauterine growth retardation, smaller head circumference, global hypertonia, coarse tremor, and extensor leg posture). Prenatal exposure to cocaine can also result in developmental problems which persist long after birth. See Arendt, Angelopoulos, Salvator, & Singer, Motor Development of Cocaine-exposed Children at Age Two Years, 103 Pediatrics 86 (1999) (concluding that, at two years of age, children who were exposed to cocaine in utero exhibited significantly less fine and gross motor development than those not so exposed); Chasnoff et al., Prenatal Exposure to Cocaine and Other Drugs: Outcome at Four to Six Years, 846 Annals of the New York Academy of Sciences 314, 319–320 (J. Harvey and B. Kosofsky eds. 1998) (finding that 4- to 6-year-olds who were exposed to cocaine in utero exhibit higher instances of depression, anxiety, social, thought, and attention problems, and delinquent and aggressive behaviors than their unexposed counterparts). There can be no doubt that a mother's ingesting this drug can cause tragic injury to a fetus and a child. There should be no doubt that South Carolina can impose punishment upon an expectant mother who has so little regard for her own unborn that she risks causing him

or her lifelong damage and suffering. The State, by taking special measures to give rehabilitation and training to expectant mothers with this tragic addiction or weakness, acts well within its powers and its civic obligations.

The holding of the Court, furthermore, does not call into question the validity of mandatory reporting laws such as child abuse laws which require teachers to report evidence of child abuse to the proper authorities, even if arrest and prosecution is the likely result. That in turn highlights the real difficulty. As this case comes to us, and as reputable sources confirm, see K. Farkas, Training Health Care and Human Services Personnel in Perinatal Substance Abuse, in Drug & Alcohol Abuse Reviews, Substance Abuse During Pregnancy and Childhood 13, 27–28 (R. Watson ed. 1995); U. S. Dept. of Health and Human Services, Substance Abuse and Mental Health Services Administration, Pregnant, Substance-Using Women 48 (1993), we must accept the premise that the medical profession can adopt acceptable criteria for testing expectant mothers for cocaine use in order to provide prompt and effective counseling to the mother and to take proper medical steps to protect the child. If prosecuting authorities then adopt legitimate procedures to discover this information and prosecution follows, that ought not to invalidate the testing. One of the ironies of the case, then, may be that the program now under review, which gives the cocaine user a second and third chance, might be replaced by some more rigorous system. We must, however, take the case as it comes to us; and the use of handcuffs, arrests, prosecutions, and police assistance in designing and implementing the testing and rehabilitation policy cannot be sustained under our previous cases concerning mandatory testing.

## III

An essential, distinguishing feature of the special needs cases is that the person searched has consented, though the usual voluntariness analysis is altered because adverse con-

sequences (*e. g.*, dismissal from employment or disqualification from playing on a high school sports team) will follow from refusal. The person searched has given consent, as defined to take into account that the consent was not voluntary in the full sense of the word. See *Skinner*, 489 U. S., at 615; *Von Raab*, 489 U. S., at 660–661; *Acton*, 515 U. S., at 650–651. The consent, and the circumstances in which it was given, bear upon the reasonableness of the whole special needs program.

Here, on the other hand, the question of consent, even with the special connotation used in the special needs cases, has yet to be decided. Indeed, the Court finds it necessary to take the unreal step of assuming there was no voluntary consent at all. Thus, we have erected a strange world for deciding the case.

My discussion has endeavored to address the permissibility of a law enforcement purpose in this artificial context. The role played by consent might have affected our assessment of the issues. My concurrence in the judgment, furthermore, should not be interpreted as having considered or resolved the important questions raised by JUSTICE SCALIA with reference to whether limits might be imposed on the use of the evidence if in fact it were obtained with the patient's consent and in the context of the special needs program. Had we the prerogative to discuss the role played by consent, the case might have been quite a different one. All are in agreement, of course, that the Court of Appeals will address these issues in further proceedings on remand.

With these remarks, I concur in the judgment.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join as to Part II, dissenting.

There is always an unappealing aspect to the use of doctors and nurses, ministers of mercy, to obtain incriminating evidence against the supposed objects of their ministration— although here, it is correctly pointed out, the doctors and

nurses were ministering not just to the mothers but also to the children whom their cooperation with the police was meant to protect. But whatever may be the correct social judgment concerning the desirability of what occurred here, that is not the issue in the present case. The Constitution does not resolve all difficult social questions, but leaves the vast majority of them to resolution by debate and the democratic process—which would produce a decision by the citizens of Charleston, through their elected representatives, to forbid or permit the police action at issue here. The question before us is a narrower one: whether, whatever the desirability of this police conduct, it violates the Fourth Amendment's prohibition of unreasonable searches and seizures. In my view, it plainly does not.

## I

The first step in Fourth Amendment analysis is to identify the search or seizure at issue. What petitioners, the Court, and to a lesser extent the concurrence really object to is not the urine testing, but the hospital's reporting of positive drug-test results to police. But the latter is obviously not a search. At most it may be a "derivative use of the product of a past unlawful search," which, of course, "work[s] no new Fourth Amendment wrong" and "presents a question, not of rights, but of remedies." *United States* v. *Calandra,* 414 U. S. 338, 354 (1974). There is only one act that could conceivably be regarded as a search of petitioners in the present case: the *taking* of the urine sample. I suppose the *testing* of that urine for traces of unlawful drugs could be considered a search of sorts, but the Fourth Amendment protects only against searches of citizens' "persons, houses, papers, and effects"; and it is entirely unrealistic to regard urine as one of the "effects" (*i. e.,* part of the property) of the person who has passed and abandoned it. Cf. *California* v. *Greenwood,* 486 U. S. 35 (1988) (garbage left at curb is not property protected by the Fourth Amendment). Some would argue,

I suppose, that testing of the urine is prohibited by some generalized privacy right "emanating" from the "penumbras" of the Constitution (a question that is not before us); but it is not even arguable that the testing of urine that has been lawfully obtained is a Fourth Amendment search. (I may add that, even if it were, the factors legitimizing the taking of the sample, which I discuss below, would likewise legitimize the testing of it.)

It is rudimentary Fourth Amendment law that a search which has been consented to is not unreasonable. There is no contention in the present case that the urine samples were extracted forcibly. The only conceivable bases for saying that they were obtained without consent are the contentions (1) that the consent was coerced by the patients' need for medical treatment, (2) that the consent was uninformed because the patients were not told that the tests would include testing for drugs, and (3) that the consent was uninformed because the patients were not told that the results of the tests would be provided to the police.[1] (When the court below said that it was reserving the factual issue of consent, see 186 F. 3d 469, 476 (CA4 1999), it was referring at most to these three—and perhaps just to the last two.)

---

[1] The Court asserts that it is improper to "disaggregate the taking and testing of the urine sample from the reporting of the results to the police," because "in our special needs cases, we have routinely treated urine screens taken by state agents as searches within the meaning of the Fourth Amendment." *Ante*, at 76, n. 9. But in all of those cases, the urine was obtained involuntarily. See *Chandler* v. *Miller*, 520 U. S. 305 (1997); *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995); *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602 (1989); *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989). Where the taking of the urine sample is unconsented (and thus a Fourth Amendment search), the subsequent testing and reporting of the results to the police are obviously part of (or infected by) the same search; but where, as here, the taking of the sample was not a Fourth Amendment search, it is necessary to consider separately whether the testing and reporting were.

Under our established Fourth Amendment law, the last two contentions would not suffice, even without reference to the special-needs doctrine. The Court's analogizing of this case to *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and its claim that "standards of knowing waiver" apply, *ante*, at 85, are flatly contradicted by our jurisprudence, which shows that using lawfully (but deceivingly) obtained material for purposes other than those represented, and giving that material or information derived from it to the police, is not unconstitutional. In *Hoffa* v. *United States*, 385 U. S. 293 (1966), "[t]he argument [was] that [the informant's] failure to disclose his role as a government informant vitiated the consent that the petitioner gave" for the agent's access to evidence of criminal wrongdoing, *id.*, at 300. We rejected that argument, because "the Fourth Amendment [does not protect] a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.*, at 302. Because the defendant had voluntarily provided access to the evidence, there was no reasonable expectation of privacy to invade. Abuse of trust is surely a sneaky and ungentlemanly thing, and perhaps there should be (as there are) laws against such conduct by the government. See, *e. g.*, 50 U. S. C. § 403–7 (1994 ed., Supp. IV) (prohibiting the "Intelligence Community['s]" use of journalists as agents). That, however, is immaterial for Fourth Amendment purposes, for "*however strongly* a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities." *United States* v. *White*, 401 U. S. 745, 749 (1971) (emphasis added). The *Hoffa* line of cases, I may note, does not distinguish between operations meant to catch a criminal in the act, and those meant only to gather evidence of prior wrongdoing. See, *e. g.*, *United States* v. *Miller*, 425 U. S. 435, 440–443 (1976); cf. *Illinois* v. *Perkins*, 496 U. S. 292, 298 (1990) (relying on *Hoffa* in holding the

*Miranda* rule did not require suppression of an inmate confession given an agent posing as a fellow prisoner).

Until today, we have *never* held—or even suggested—that material which a person voluntarily entrusts to someone else cannot be given by that person to the police, and used for whatever evidence it may contain.[2] Without so much as discussing the point, the Court today opens a hole in our Fourth Amendment jurisprudence, the size and shape of which is entirely indeterminate. Today's holding would be remarkable enough if the confidential relationship violated by the police conduct were at least one protected by state law. It would be surprising to learn, for example, that in a State which recognizes a spousal evidentiary privilege the police cannot use evidence obtained from a cooperating husband or wife. But today's holding goes even beyond that, since there does not exist any physician-patient privilege in South Carolina. See, *e. g.*, *Peagler* v. *Atlantic Coast R. R. Co.*, 232 S. C. 274, 101 S. E. 2d 821 (1958). Since the Court declines even to discuss the issue, it leaves law enforcement officials entirely in the dark as to when they can use incriminating evidence obtained from "trusted" sources.[3] Presumably the

---

[2] *Hoffa* did say that the Fourth Amendment can be violated by "guileful as well as by forcible intrusions into a constitutionally protected area." 385 U. S., at 301. The case it cited for that proposition, however, shows what it meant: *Gouled* v. *United States*, 255 U. S. 298 (1921), found a Fourth Amendment violation where a Government agent who had obtained access to the defendant's office on pretext of a social visit carried away private papers. "Guile" (rather than force) had been used to *go beyond the scope of the consented access to evidence*. Whereas the search in *Gouled* was invalidated, the search was approved in *Lewis* v. *United States*, 385 U. S. 206 (1966), where an equally guileful agent stayed within the bounds of the access to defendant's home, carrying away only a package of drugs that had been voluntarily provided.

[3] The Court contends that its opinion does not leave law enforcement officials in the dark as to when they can use incriminating evidence from trusted sources, since it "do[es] not address a case in which doctors independently complied with reporting requirements," *ante*, at 85, n. 24. I find it hard to understand how not addressing that point fails to leave

lines will be drawn in the case-by-case development of a whole new branch of Fourth Amendment jurisprudence, taking yet another social judgment (which confidential relationships ought not be invaded by the police) out of democratic control, and confiding it to the uncontrolled judgment of this Court—uncontrolled because there is no common-law precedent to guide it. I would adhere to our established law, which says that information obtained through violation of a relationship of trust is obtained consensually, and is hence not a search.[4]

---

it enshrouded in darkness—unless the Court means that such reporting requirements are clearly bad. (If voluntary betrayal of a trust in mere *cooperation* with the police constitutes a Fourth Amendment search, surely betrayal of a trust *at the direction* of the legislature must be.) But in any event, reporting requirements are an infinitesimal part of the problem. What about a doctor's—or a spouse's—voluntary provision of information to the police, without the compulsion of a statute?

[4]The Court contends that I am "mischaracteriz[ing]" its opinion, since the Court is merely "assum[ing] for purposes of decision that the patients did *not* consent to the searches, and [leaves] the question of consent for the Court of Appeals to determine." *Ibid.* That is not responsive. The "question of consent" that the Court leaves open is whether the patients consented, not merely to the taking of the urine samples, but to the drug testing in particular, and to the provision of the results to the police. Consent to the taking of the samples alone—or even to the taking of the samples *plus* the drug testing—does not suffice. The Court's contention that the question of the sufficiency of that more limited consent is not before us because respondents did not raise it, see *ante*, at 74, n. 6, is simply mistaken. Part II of respondents' brief, entitled "The Petitioners consented to the searches," argues that "Petitioners . . . freely and voluntarily . . . provided the urine samples"; that "each of the Petitioners signed a consent to treatment form which authorized the MUSC medical staff to conduct all necessary tests of those urine samples—including drug tests"; and that "[t]here is no precedent in this Court's Fourth Amendment search and seizure jurisprudence which imposes any . . . requirement that the searching agency inform the consenting party that the results of the search will be turned over to law enforcement." Brief for Respondents 38–39. The brief specifically *takes issue* with the District Court's charge to the jury—which the Court chooses to accept as an unexaminable "given," see *ante*, at 74, n. 6—that "the Respondents were required to

There remains to be considered the first possible basis for invalidating this search, which is that the patients were coerced to produce their urine samples by their necessitous circumstances, to wit, their need for medical treatment of their pregnancy. If that was coercion, it was not coercion applied by the government—and if such nongovernmental coercion sufficed, the police would never be permitted to use the ballistic evidence obtained from treatment of a patient with a bullet wound. And the Fourth Amendment would invalidate those many state laws that require physicians to report gunshot wounds,[5] evidence of spousal abuse,[6] and (like the South Carolina law relevant here, see S. C. Code Ann. § 20–7–510 (2000)) evidence of child abuse.[7]

---

show that the Petitioners consented to MUSC disclosing the information to law enforcement." Brief for Respondents 39.

In sum, I think it clear that the Court's disposition requires the holding that violation of a relationship of trust constitutes a search. The opinion itself implies that in its description of the issue left for the Court of Appeals on remand, see *ante*, at 77, n. 11: whether "the tests were performed without the *informed* consent of the patients," *ante*, at 77 (emphasis added)—informed, that is, that the urine would be tested for drugs and that the results would be given to the police. I am happy, of course, to accept the Court's illogical assurance that it intends no such holding, and urge the Court of Appeals on remand to do the same.

[5] See, *e. g.*, Cal. Penal Code Ann. § 11160 (West Supp. 2001); N. Y. Penal Law § 265.25 (McKinney 2000); S. C. Code Ann. § 16–3–1072 (Supp. 2000).

[6] See, *e. g.*, Cal. Penal Code Ann. § 11160 (West Supp. 2001); Colo. Rev. Stat. § 12–36–135 (2000).

[7] The Court contends that I "would have us . . . resolve the issue of consent in favor of respondents," whereas the Court's opinion "more prudent[ly] allow[s] [the Court of Appeals] to resolve the legal and factual issues in the first instance, and . . . express[es] no view on those issues." *Ante*, at 77, n. 11. That is not entirely so. The Court does not resolve the factual issue whether there was consent to the drug testing and to providing the results to the police; and neither do I. But the Court *does* resolve the legal issue whether *that* consent was necessary, see *ante*, at 77, 84–85, and n. 24; and so do I. Since the Court concludes it was necessary, the factual inquiry is left for the Fourth Circuit on remand. Since I conclude it was not necessary (and since no one contends that the taking

## II

I think it clear, therefore, that there is no basis for saying that obtaining of the urine sample was unconstitutional. The special-needs doctrine is thus quite irrelevant, since it operates only to validate searches and seizures that are otherwise unlawful. In the ensuing discussion, however, I shall assume (contrary to legal precedent) that the taking of the urine sample was (either because of the patients' necessitous circumstances, or because of failure to disclose that the urine would be tested for drugs, or because of failure to disclose that the results of the test would be given to the police) coerced. Indeed, I shall even assume (contrary to common sense) that the testing of the urine constituted an unconsented search of the patients' effects. On those assumptions, the special-needs doctrine *would* become relevant; and, properly applied, would validate what was done here.

The conclusion of the Court that the special-needs doctrine is inapplicable rests upon its contention that respondents "undert[ook] to obtain [drug] evidence from their patients" not for any medical purpose, but *"for the specific purpose of incriminating those patients."* Ante, at 85 (emphasis in original). In other words, the purported medical rationale was merely a pretext; there was no special need. See *Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602, 621, n. 5 (1989). This contention contradicts the District Court's finding of fact that the goal of the testing policy "was not to arrest patients but to facilitate their treatment and protect both the mother and unborn child." App. to Pet. for Cert. A–38.[8] This finding is binding upon us unless clearly erro-

---

of the urine sample was unconsented), there is on my analysis no factual consent issue remaining.

[8] The Court believes that this finding "must be read in light of" the District Court's comment that "'these searches were not done by the medical university for independent purposes. . . . [T]he police came in and there was an agreement reached that the positive screens would be shared with the police. And then the screen is not done independent of police,

neous, see Fed. Rule Civ. Proc. 52(a). Not only do I find it supportable; I think any other finding would have to be overturned.

The cocaine tests started in April 1989, *neither at police suggestion nor with police involvement.* Expectant mothers who tested positive were referred by hospital staff for substance-abuse treatment, *ante,* at 70 (opinion of the Court)—an obvious health benefit to both mother and child. See App. 43 (testimony that a single use of cocaine can cause fetal damage). And, since "[i]nfants whose mothers abuse cocaine during pregnancy are born with a wide variety of physical and neurological abnormalities," *ante,* at 89 (KENNEDY, J., concurring in judgment), which require medical attention, see Brief in Opposition A76–A77, the tests were of additional medical benefit in predicting needed postnatal treatment for the child. Thus, in their origin—before the police were in any way involved—the tests had an immediate, not merely an "ultimate," *ante,* at 82 (opinion of the Court), purpose of improving maternal and infant health. Several months after the testing had been initiated, a nurse discovered that local police were arresting pregnant users of cocaine for child abuse, the hospital's general counsel wrote the county solicitor to ask "what, if anything, our Medical Center needs to do to assist you in this matter," App. 499 (South Carolina law requires child abuse to be reported, see S. C. Code Ann. § 20–7–510), the police suggested ways to avoid tainting evidence, and the hospital and police in conjunction used the testing program as a means of securing what the Court calls the "ultimate" health benefit of coercing drug-abusing mothers into drug treatment. See *ante,* at 70–73, 82. Why would there be any reason to believe that, once

---

it's done in conjunction with the police and that implicates the Fourth Amendment.'" *Ante,* at 75, n. 8, quoting App. 1247–1249. But all this shows is that the explicit finding of medical purpose was not a finding of *exclusive* medical purpose. As discussed later in text, the special-needs doctrine contains no such exclusivity requirement.

this policy of using the drug tests for their "ultimate" health benefits had been adopted, use of them for their original, *immediate*, benefits somehow disappeared, and testing somehow became in its entirety nothing more than a "pretext" for obtaining grounds for arrest? On the face of it, this is incredible. The only evidence of the exclusively arrest-related purpose of the testing adduced by the Court is that the police-cooperation policy *itself* does not describe how to care for cocaine-exposed infants. See *ante*, at 73, 82. But *of course* it does not, since that policy, adopted months after the cocaine testing was initiated, had as its only health object the "ultimate" goal of inducing drug treatment through threat of arrest. Does the Court really believe (or even *hope*) that, once invalidation of the program challenged here has been decreed, drug testing will cease?

In sum, there can be no basis for the Court's purported ability to "distinguis[h] this case from circumstances in which physicians or psychologists, in the course of ordinary medical procedures aimed at helping the patient herself, come across information that . . . is subject to reporting requirements," *ante*, at 80–81, unless it is this: That the *addition* of a law-enforcement-related purpose *to* a legitimate medical purpose destroys applicability of the "special-needs" doctrine. But that is quite impossible, since the special-needs doctrine was developed, and is ordinarily employed, precisely to enable searches *by law enforcement officials* who, of course, ordinarily have a law enforcement objective. Thus, in *Griffin* v. *Wisconsin*, 483 U. S. 868 (1987), a probation officer received a tip from a detective that petitioner, a felon on probation, possessed a firearm. Accompanied by police, he conducted a warrantless search of petitioner's home. The weapon was found and used as evidence in the probationer's trial for unlawful possession of a firearm. See *id.*, at 870–872. Affirming denial of a motion to suppress, we concluded that the "special need" of assuring compliance with terms of release

justified a warrantless search of petitioner's home. Notably, we observed that a probation officer is not

> "the police officer who normally conducts searches against the ordinary citizen. He is an employee of the State Department of Health and Social Services who, while assuredly charged with protecting the public interest, is also supposed to have in mind the welfare of the probationer .... In such a setting, we think it reasonable to dispense with the warrant requirement." *Id.*, at 876–877.

Like the probation officer, the doctors here do not "ordinarily conduc[t] searches against the ordinary citizen," and they are "supposed to have in mind the welfare of the [mother and child]." That they have in mind in addition the provision of evidence to the police should make no difference. The Court suggests that if police involvement in this case was in some way incidental and after-the-fact, that would make a difference in the outcome. See *ante,* at 80–84. But in *Griffin,* even more than here, police were involved in the search from the very beginning; indeed, the initial tip about the gun came from a detective. Under the factors relied upon by the Court, the use of evidence approved in *Griffin* would have been permitted only if the parole officer had been untrained in chain-of-custody procedures, had not known of the possibility a gun was present, and had been unaccompanied by police when he simply happened upon the weapon. Why any or all of these is constitutionally significant is baffling.

Petitioners seek to distinguish *Griffin* by observing that probationers enjoy a lesser expectation of privacy than does the general public. That is irrelevant to the point I make here, which is that the presence of a law enforcement purpose does not render the special-needs doctrine inapplicable. In any event, I doubt whether Griffin's reasonable expectation of privacy in his home was any less than petitioners' reasonable expectation of privacy in their urine taken,

or in the urine tests performed, in a hospital—especially in a State such as South Carolina, which recognizes no physician-patient testimonial privilege and requires the physician's duty of confidentiality to yield to public policy, see *McCormick* v. *England,* 328 S. C. 627, 633, 640–642, 494 S. E. 2d 431, 434, 438–439 (App. 1997); and which requires medical conditions that indicate a violation of the law to be reported to authorities, see, *e. g.,* S. C. Code Ann. § 20–7–510 (2000) (child abuse). Cf. *Whalen* v. *Roe,* 429 U. S. 589, 597–598 (1977) (privacy interest does not forbid government to require hospitals to provide, for law enforcement purposes, names of patients receiving prescriptions of frequently abused drugs).

The concurrence makes essentially the same basic error as the Court, though it puts the point somewhat differently: "The special needs cases we have decided," it says, "do not sustain the active use of law enforcement . . . as an integral part of a program which seeks to achieve legitimate, civil objectives." *Ante,* at 88. *Griffin* shows that is not true. Indeed, *Griffin* shows that there is not even any truth in the more limited proposition that our cases do not support application of the special-needs exception where the "legitimate, civil objectives" are sought only *through* the use of law enforcement means. (Surely the parole officer in *Griffin* was using threat of reincarceration to assure compliance with parole.) But even if this latter proposition *were* true, it would invalidate what occurred here only if the drug testing sought exclusively the "ultimate" health benefits achieved by coercing the mothers into drug treatment through threat of prosecution. But in fact the drug testing sought, independently of law enforcement involvement, the "immediate" health benefits of identifying drug-impaired mother and child for necessary medical treatment. The concurrence concedes that if the testing is conducted for medical reasons, the fact that "prosecuting authorities *then* adopt legitimate procedures to discover this information and prosecution follows

... ought not to invalidate the testing." *Ante*, at 90 (emphasis added). But here the police involvement in each case did *take place after* the testing was conducted for independent reasons. Surely the concurrence cannot mean that no police-suggested procedures (such as preserving the chain of custody of the urine sample) can be applied until *after* the testing; or that the police-suggested procedures must have been *designed* after the testing. The facts in *Griffin* (and common sense) show that this cannot be so. It seems to me that the only real distinction between what the concurrence must reasonably be thought to be approving, and what we have here, is that here the police took the lesser step of initially *threatening* prosecution rather than bringing it.

\* \* \*

As I indicated at the outset, it is not the function of this Court—at least not in Fourth Amendment cases—to weigh petitioners' privacy interest against the State's interest in meeting the crisis of "crack babies" that developed in the late 1980's. I cannot refrain from observing, however, that the outcome of a wise weighing of those interests is by no means clear. The initial goal of the doctors and nurses who conducted cocaine testing in this case was to refer pregnant drug addicts to treatment centers, and to prepare for necessary treatment of their possibly affected children. When the doctors and nurses agreed to the program providing test results to the police, they did so because (in addition to the fact that child abuse was required by law to be reported) they wanted to use the sanction of arrest as a strong incentive for their addicted patients to undertake drug-addiction treatment. And the police themselves used it for that benign purpose, as is shown by the fact that only 30 of 253 women testing positive for cocaine were ever arrested, and only 2 of those prosecuted. See App. 1125–1126. It would not be unreasonable to conclude that today's judgment, authorizing the assessment of damages against the county

solicitor and individual doctors and nurses who participated in the program, proves once again that no good deed goes unpunished.

But as far as the Fourth Amendment is concerned: There was no unconsented search in this case. And if there was, it would have been validated by the special-needs doctrine. For these reasons, I respectfully dissent.