HOLLOWAY, Circuit Judge,
dissenting:
I am unable to join the majority’s holdings and so must respectfully dissent. I agree with the majority that we have jurisdiction to review the legal issues in these appeals.
I. Appeal No. 09-2273
A
In this, the first of these related appeals, the Appellants are Officers Bader, Thompson, and Carter (the Officers), three Albuquerque police officers. The claims against these Officers were brought by Jason Kerns and his parents, Archie Kerns and Mary Ann Kerns (Plaintiffs). Plaintiffs sought damages against the Officers under 42 U.S.C. § 1983 for violation of their Fourth Amendment right to be free of unreasonable searches. This claim arose from the Officers’ entry in the Plaintiffs’ residence on the night of the helicopter crash.
*1191 I would affirm the district court’s denial of the Officers’ motion for summary judgment sought on grounds of qualified immunity. The district court held that a jury could find that there was no imminent threat that would justify the Officers’ entry into the Plaintiffs’ home. The Officers’ only argument on appeal is that there were exigent circumstances, which under established law would have justified their intrusion into the home.
Because our review is limited to questions of law, it is not necessary to enlarge on the majority’s summary of the facts, even though the majority seems to have strayed at times from viewing the facts in the light most favorable to Plaintiffs as we are constrained to do in the posture of this appeal.[1] It is sufficient to note that the district court held that the jury would have to decide if a reasonable officer would have perceived that an imminent danger existed that would justify the entry. We do not have jurisdiction to review that holding in this interlocutory appeal. See Johnson v. Jones, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).
The Officers do attempt to frame their argument as a legal issue. They contend that the district court erred in its application of the legal standards enunciated in United States v. Najar, 451 F.3d 710 (10th Cir.2006). But in fact their argument rests on rejection of the district court’s holding that the jury must decide questions of fact pertaining to whether a reasonable officer would have perceived an immediate need to protect himself or others under the circumstances. And as noted, that holding is not reviewable in this interlocutory appeal.
The Officers do not contend that their entry into the home was justified on any other basis. Therefore, if exigent circumstances did not exist, the Plaintiffs’ Fourth Amendment rights were violated by the Officers’ entry into their home. I thus do not understand the majority’s assertion that there is no easy answer to either of the two questions involved in the qualified immunity analysis. On the facts as we must take them, ie., that Plaintiffs produced sufficient evidence in the district court to support a possible jury finding in their favor on the underlying factual questions, the answer to the first question surely is easy: An entry into the home is unlawful when there is neither a warrant nor probable cause and when the purported exigency is not one that would cause a reasonable officer to believe that someone inside the home was either an imminent threat to others or was herself in imminent danger.
B
I disagree with the majority’s assertion that the district judge did not address the second prong of the qualified immunity analysis (the clearly established right prong). First, I note that the Officers made only the slightest gesture towards raising the issue concerning a clearly established right in the district court. Indeed, to show that the issue was raised, the majority is only able to point to a single sentence in a sub-heading of the Officers’ summary judgment briefing. There, the Officers made only a conclusory assertion that the Plaintiffs had not shown the violation of a clearly established right.[2] *1192 I am willing to agree that this was sufficient to raise the issue. But I highlight this point to underscore that the district court’s concise treatment of the issue is completely unsurprising in light of the Officers’ failure to make any reasoned argument on the issue.
In spite of the fact that the Officers had merely referred to a general principle rather than making a reasoned argument, the district judge nevertheless prefaced his analysis with a thorough discussion of the applicable law. First, the judge assessed what is meant by a clearly established right, ApltApp. 217, and then moved on to discuss the law to be applied to Plaintiffs’ claims in this case. After quoting the Fourth Amendment, the judge noted the applicable principles of Fourth Amendment law: For a search without a warrant to be valid, it must fall within a recognized exception to the warrant requirement; searches within the home without a warrant “are presumptively unreasonable”;[3] the home is entitled to the greatest protection under the Fourth Amendment;[4] and the government bears the burden of proving that the exigency exception to the warrant requirement applies, a burden which is “especially heavy when the exception must justify the warrantless entry of a home.”[5] As the district judge then proceeded to apply the Fourth Amendment principles to the evidence submitted by the parties, he prefaced that analysis with the assertion that the Plaintiffs “have a Fourth Amendment expectation of privacy in their own home that is well-established.” Aplt. App. at 220. Each of these statements of the governing legal principles is beyond dispute, of course.
The district court merely held that, depending on what facts are found by the jury, the Officers may have entered the Plaintiffs’ home when no reasonable officer would have perceived any imminent danger to anyone. Such an entry would violate the clearly established law that the district judge had surveyed.
I disagree with the majority’s view that the district judge’s analysis was inadequate because it was based only on generalized principles. Some cases do indeed require a more particularized inquiry. This is not one of them. As discussed more fully in Part II-B of this dissent, “general statements of the law are not inherently incapable of giving fair and clear warning....” Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).
Thus the majority is incorrect to say that the district judge did not address the second prong of the qualified immunity analysis. The question is not a difficult one in my view, and so I disagree with the majority’s decision to remand the matter to the district court to rule again on this strictly legal question. The Officers had neither a warrant nor probable cause. If the circumstances they encountered did not support a reasonable belief that danger to someone was imminent, then the armed, nighttime entry into the home violated clearly established Fourth Amendment law. The district judge’s ruling denying summary judgment for the Officers should be affirmed.
Even if I were otherwise in agreement with the majority in this first of these *1193 appeals, I would still disagree with its formulation of the issue to be addressed by the district court on remand. Maj. op. at 1183. The majority states the issue with a myopic focus on the facts of this case, apparently inviting the district court to indulge in, rather than avoid, a “scavenger hunt for prior cases with precisely the same facts.”[6] Moreover, the majority’s statement of the issue it would have the district court address suffers from other flaws. The majority’s reference to the Officers’ “belief’ that exigent circumstances existed should not deter the district court on remand from correctly focusing on whether a reasonable officer would have believed that exigent circumstances existed (an issue which, as I have said, must in this case be resolved by the jury).
The majority’s assertion that the district court must consider the Officers’ “claim that their intrusion was justified in part because of the consent Ms. Zisser supplied (at least after the incursion was first made)” is surprising because the Officers have not made this contention on appeal. More importantly, the majority’s instruction to the district court that it should consider this is very problematic because the issue appears to be one that the district court on remand in the summary judgment stage must resolve against the Officers. Ms. Zisser testified that she was unaware of the Officers until they had already crossed the threshold. Obviously being unaware of their entry, she did not consent to it. Encountering armed officers inside the home in the middle of the night, Ms. Zisser did not tell them to leave immediately. The district court noted that Ms. Zisser had stated (presumably in her deposition) that “she did not feel she could deny the officers’ request [to look around inside the house], as they had their weapons displayed.” ApltApp. at 213-14. Barring a concession by the Plaintiffs that Ms. Zisser’s consent was voluntarily given, which seems most unlikely given her testimony, I believe that in its reconsideration of the Officers’ motion for summary judgment, the district court must regard the Officers’ continued presence in the home as being without consent.
II. Appeal No. 10-2103
This appeal is brought by Sheriff White, Deputy Lindley and Deputy Koren. The claims against White, Lindley, and Koren were brought only by Jason Kerns. The issues raised by Sheriff White are, however, quite distinct from those raised by Deputies Lindley and Koren. The issues raised by the latter two are in fact related to the issues raised in the third of these three related appeals and accordingly will be addressed in Part III of this dissent.
A
I must respectfully dissent from the majority’s decision to reverse the district court’s proper denial of Sheriff White’s motion for summary judgment sought on qualified immunity grounds. The claim against Sheriff White is based on the Sheriffs role in acquiring Jason Kerns’s medical records from the Veterans Administration.[7] Because I would affirm the district court’s ruling denying Sheriff White’s motion for summary judgment, I would nec *1194 essarily address both prongs of the qualified immunity defense.
Jason Kerns served in our military. Like far too many others, he apparently came home from his service only to experience difficulties adjusting to civilian life. Without examining the confidential medical records that are the subject of his claim against Sheriff White, we do not know what caused him to seek psychiatric treatment at his local Veterans Administration Hospital, nor do we know more than that he was diagnosed as suffering from post-traumatic stress disorder. We do know, or in any event his attorney tells us and our precedents require us to assume, that his treatment involved disclosure to his caregivers of intimate details of his personal life.
In the course of investigating the crash of the Albuquerque police helicopter, Sheriff White apparently learned that Jason Kerns had told an officer that he had post-traumatic stress disorder. Sheriff White thus thought it possible that Kerns’s mere possession of firearms might be illegal, owing to the fact that Mr. Kerns’s voluntary treatment for post-traumatic stress disorder suggested the possibility, although not the likelihood, that he had been committed to a mental institution or adjudicated a mental defective.[8] Acting on this possibility,[9] Sheriff White requested from the VA hospital, by letter, “any and all records” relevant to Mr. Kerns’s “psychiatric condition as it would apply to 18 U.S.C. [§ ] 922(g)(4).” And for some reason the Sheriff decided to seek information from the VA rather than from the courts, where public record of any such adjudication or involuntary commitment would have been found (as any competent law enforcement officer undoubtedly would have known).[10] In response to his letter, the Sheriffs deputy received Jason’s entire medical file from the VA. Every intimate detail that Jason had reported to his caregivers under a presumption of confidentiality was relayed to the Sheriffs deputy for his perusal.[11]
Sheriff White undertook to obtain all of Jason’s records,[12] in spite of their privileged nature, without consent, without a warrant or any other judicial process, in the complete absence of exigent circumstances, and without probable cause; his request was based only on his suspicion *1195 that a crime might have been committed.[13] If constitutional privacy protections mean anything at all, this conduct violated Plaintiffs right of privacy. As discussed infra, I believe that this is so obvious and so solidly grounded in existing law that a reasonable public official should have known that this intrusion into the Plaintiffs privacy was unlawful. Because the violation of Mr. Kerns’s constitutional rights must be discussed in that context, I will forgo further elaboration of my views on that point and turn to the majority’s decision to avoid deciding whether a constitutional violation occurred here.
I strongly believe that the majority’s decision to avoid the question whether the Plaintiffs rights were violated is unwise. In Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Court held that lower federal courts have the discretion to address only the second or “clearly established right” prong of the qualified immunity analysis, abrogating its holding in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Nevertheless, even as the Court removed the requirement for the lower courts to address first whether a constitutional violation had occurred, the Court went on to explain that there remain sound reasons for addressing the first prong in many cases. Pearson, 555 U.S. at 236, 129 S.Ct. 808. This is such a case.
As the Court noted more recently, “our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo.” Camreta v. Greene, - U.S. -, 131 S.Ct. 2020, 2031, 179 L.Ed.2d 1118 (2011). Dismissing cases on the second prong of the qualified immunity analysis “thus may frustrate the development of constitutional precedent and the promotion of law-abiding behavior.” Id. (internal quotation marks omitted). The Court also cautioned there that lower courts should avoid turning small cases into large ones, as the majority notes in discussing the first of these three appeals. But this case does not present that danger because the answer to the first question is so patent.
On the other hand, however, the majority insists that this is a contentious, complicated question. The obvious implication is that the Sheriffs conduct here might have been lawful. In other words, even though the majority is willing to “accept for our purposes at step two” that Jason Kerns has a protected privacy interest in the very personal information contained in his medical records,[14] that protection may mean nothing in the face of a request from law enforcement for access to that very personal information. That implication should be closely scrutinized.
Suppose that Sheriff White had decided to investigate the legality of Jason Kerns’s gun ownership by checking court records. This would have been a logical thing to do, of course, since the question was whether Jason Kerns had been adjudicated a mentally defective or involuntarily committed, i.e., committed by court order, to an institution for psychiatric care. If the Sheriff had elected to pursue that course, he could have expected to encounter no obstacles, for court records are publicly available. He would not have needed a warrant, nor *1196 would he have needed to show Jason Kerns’s consent to his request for the information. There would have been no need for him to have shown probable cause or even reasonable suspicion.
In saying that the question whether a constitutional violation occurred is a complicated, difficult one that ought to be avoided in the actual circumstances presented here, the majority implicitly suggests that the law may treat Sheriff White’s acquisition of constitutionally protected, highly personal information the same way it would have treated his acquisition of information that may be readily obtained by the general public. In other words, information that has long been held to be protected by the Constitution may in fact not be protected at all but may be as readily available to law enforcement as public records are.
I cannot accede to that view. The question we face in the first prong of the qualified immunity analysis is not a complicated one but a very simple one. Because the Sheriffs conduct was so blithely oblivious to the constitutional and statutory protections afforded to the information he sought, we need not consider whether probable cause would have justified his acting without a warrant, or whether the Sheriff would have needed probable cause plus exigent circumstances for justification, to cite but one example of circumstances that could make this case less clear. This case is crystal clear. Against the protections afforded by the Constitution, the Sheriff can rely only on the fact that he had no improper motive. If this was not a constitutional violation, then intimate personal information contained in medical records is not protected by the Constitution and our precedents to the contrary are meaningless.
The majority concludes that one statement from one very different case is dis-positive here. In Douglas v. Dobbs, 419 F.3d 1097 (10th Cir.2005), we considered whether an assistant district attorney and her supervisor were entitled to qualified immunity for their role in advising law enforcement in the preparation of a “motion and order” to produce the plaintiffs pharmaceutical records. In the course of determining that the attorneys were entitled to qualified immunity at the second step of the analysis, our court observed— in what appears to be nothing more than obiter dictum — that it had not been settled whether a warrant was required to obtain the records. Id. at 1103.[15]
The majority is plainly wrong to say that this dictum addresses “the” issue presented in the instant case and that the dictum concerns “the very circumstances we now face....” Maj. op. at 1184.[16] First, the dictum addresses pharmaceutical records, not psychiatric records, and it is the latter that have been the subject of our prior cases. Further, as I have already said, the instant case requires us to consider whether privileged medical information can be obtained by law enforcement without a warrant or any other justification other than a suspicion that perhaps a crime may have been committed. It may be unclear whether a warrant is required. But the possibility that Sheriff White’s conduct could have been justified on some basis other than the existence of a proper *1197 search warrant — for example by probable cause plus exigent circumstances — has but minimal relevance to our inquiry here because of the extremely thin justification for the Sheriffs conduct here.
The majority says that the question whether a constitutional violation occurred here is further complicated by the “role of third[-]party doctrine.” Maj. op. at 1184. I do not think that the there is any complication here. Our cases on the constitutional protection afforded to intimate personal information contained in medical records, discussed more in Part II-B, infra, afford no role to third-party doctrine, nor have we recognized in those cases that United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), a case regarding bank records, has any relevance.
One case cited by the majority is of more immediate interest, however, because it provides a useful comparison. In United States v. Warshak, 631 F.3d 266 (6th Cir.2010), the court addressed the good-faith exception to the warrant requirement of the Fourth Amendment, which involves a standard similar to the qualified immunity standard. At issue in the case was the government’s acquisition of the criminal defendant’s electronic mail from his internet service provider. The government relied on the authority of a statute to support its argument that law enforcement officers had acted in objective good faith. The court held that the government could not rely on the statute if its officers had exceeded the scope of the authority granted by the statute. Id. at 289.
In the instant case, both in the district court and on appeal, Sheriff White has relied on a provision of the Federal Privacy Act. The district court rejected that argument, finding that the provision authorizing sharing of information between agencies applied only to federal agencies, and so could not authorize Sheriff White’s actions here. 707 F.Supp.2d 1190, 1257-59 (D.N.M.2010). I agree with that conclusion. Moreover, the district judge sua sponte considered whether the Sheriffs conduct might have been permissible under the Health Insurance Portability and Accountability Act, Pub.L. 104-191 (HI-PAA), and concluded that it was not. The lack of statutory authority for the Sheriffs acquisition of Plaintiffs medical records leaves Plaintiffs privacy expectation undiminished and underscores the unlawfulness of Sheriff White’s acts.
The majority says that “the scope of the Constitution’s protection for a patient’s hospital records can be adequately decided in future cases where the qualified immunity overlay isn’t in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief).” Maj. op. at 1187, n. 5. But we need not here decide the scope of the protection, only its existence. This case is about whether the protection is real or only illusory, because if the Sheriff did not violate Mr. Kerns’s rights by acquiring his medical information based on nothing more than a desire to investigate whether a crime had been committed, there is no protection at all.
We should not hesitate to declare the obvious: Courts have for decades recognized a constitutionally protected right of privacy in the highly personal information contained in medical records, and law enforcement therefore must have something more than merely a legitimate investigatory interest in the protected information to justify invading that privacy.
B
I am convinced that the district court was correct to hold that Sheriff White’s actions violated Jason Kerns’s clearly es *1198 tablished right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime might have occurred. As discussed infra, existing law certainly gave the Sheriff fair notice that his conduct was unlawful. I believe the majority errs in effectively holding that the right to privacy in medical records cannot be “clearly established” absent an affirmation of the right in some prior case with factual circumstances that differ only trivially.
As Judge Posner has aptly and succinctly noted in pointing out that denial of qualified immunity can be proper even absent an earlier factually identical case, “The easiest cases don’t even arise.” K.H. Through Murphy v. Morgan, 914 F.2d 846, 851 (7th Cir.1990). This is a pertinent maxim when applied to Sheriff White’s actions. Sheriff White’s asking the VA for Mr. Kerns’s private medical records in the circumstances existing here is so far out of the realm of constitutional behavior that we should not hesitate to hold that it was unlawful, even if we did not have precedents closely on point that mandate that result. But the precedents that do exist are easily close enough on point that any reasonable law enforcement officer would have known that constitutionally protected medical records cannot be obtained simply because a possibility exists that the information would be helpful. Constitutional protection means that such records cannot be routinely obtained without a warrant, without consent, without probable cause, and without exigent circumstances.
We have recognized for at least 25 years that the type of intimate, personal information contained in medical records is protected under the Constitution. Mangels v. Pena, 789 F.2d 836, 839 (10th Cir.1986). In Mangels we said that information “is constitutionally protected when a legitimate expectation exists that it will remain confidential while in the state’s possession.” Id. We noted specifically there that medical records are within the ambit of this protection. Id. (citing United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir.1980)). We acknowledged in Flanagan v. Munger, 890 F.2d 1557, 1570 (10th Cir.1989), that judicial recognition of the “constitutional right to privacy [which] protects an individual’s interest in preventing disclosure by the government of personal matters” goes back at least to Whalen v. Roe, 429 U.S. 589, 599 & n. 24, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).
Psychiatric records have been afforded even greater protection. The Supreme Court has held that an evidentiary privilege exists to protect the “confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment” under Fed. R.Evid. 501. Jaffee v. Redmond, 518 U.S. 1, 15, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). Two years after that, we vacated a criminal conviction that had been based on statements made by the defendant to his psychiatrist, holding that the district court had failed to determine whether the privilege could have been overcome in the circumstances. United States v. Glass, 133 F.3d 1356 (10th Cir.1998).
The Supreme Court has taught that the “reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with non-medical personnel without her consent.” Ferguson v. City of Charleston, 532 U.S. 67, 78, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). Long before Ferguson, this court had recognized the fundamental principle that medical records contain very personal and private information and are entitled to constitutional protection. See, e.g., Lank- *1199 ford v. City of Hobart, 27 F.3d 477 (10th Cir.1994).
Here, however, Sheriff White obtained Jason Kerns’s very private medical records without any recognition that those materials were constitutionally protected. If law enforcement may obtain medical records as easily as they can request publicly available information, as was done here, then the special privacy protection extended to our medical records by the Constitution is rendered meaningless. I therefore disagree with the majority’s dismaying conclusion, see Maj. op. at 1183-86, that Mr. Kerns did not enjoy a clearly established right to have his VA medical records kept private from law enforcement authorities who were acting without a warrant, without consent, without probable cause — indeed, acting only on mere suspicion that a crime possibly may have been committed, and in the absence of any exigent circumstances.
In considering whether Sheriff White’s conduct violated clearly established law, we must not engage in a “scavenger hunt for prior cases with precisely the same facts” but should instead focus on “the more relevant inquiry,” whether the existing law gave Sheriff White “fair notice” that his conduct was unconstitutional. Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.2004). “[Tjhere need not be precise factual correspondence between earlier cases and the case at hand, because ‘general statements of the law are not inherently incapable of giving fair and clear warning....’” Anderson v. Blake, 469 F.3d 910, 913-14 (10th Cir.2006) (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508,153 L.Ed.2d 666 (2002)).
Yet the majority goes on to highlight factual distinctions from prior cases as it defends its holding that Plaintiffs rights were not so clearly established that a reasonable law enforcement officer would have known that his conduct violated those rights. I would adhere to the patently clear principle that individuals have a constitutional right to have their medical records kept private from law enforcement officers pursuing general investigative ends and acting in the absence of any authority to breach that privacy. See Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001); Lankford v. City of Hobart, 27 F.3d 477 (10th Cir.1994); ALA. v. West Valley City, 26 F.3d 989 (10th Cir.1994).
Like the district judge in this case, I believe our cases gave more than “fair notice” that the constitutional protections afforded private medical records require law enforcement to show more than that the records could possibly include evidence of a crime. A reasonably competent law enforcement official must be held to know that it means something that medical information has for years been afforded privacy protection under the Constitution.
In Lankford v. City of Hobart, 27 F.3d 477 (10th Cir.1994), the court considered the section 1983 claims of two dispatchers of the Hobart Police Department. One of these women, Ms. Calvary, had alleged that the former police chief, Mr. Medrano, had “used his authority as chief of police to obtain Ms. Calvary’s private medical records without her consent from a local hospital in an attempt to discredit her or to prove his statements that she was a lesbian.” 27 F.3d at 478. We held that the district court had correctly ruled that Ms. Calvary had pleaded the violation of her well established right to privacy in her medical records, reasoning that “there is no question that an employee’s medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection.” Id. (emphasis added; citations and internal quotation marks omitted). *1200 And in a second case decided over seventeen years ago we recognized that “[tjhere is no dispute that confidential medical information is entitled to constitutional privacy protection.” A.L.A. v. West Valley City, 26 F.3d 989, 990 (10th Cir.1994) (emphasis added).
Thus, at least eleven years before Sheriff White obtained Plaintiff Jason Kerns’s medical records, we had held that similar conduct violated well established rights. The majority, however, is unpersuaded that cases like Lankford are sufficient to satisfy the second prong of the qualified immunity test. This is because, we are told, “most” of the cases cited by Plaintiff Jason Kerns involved police publicly disclosing the private information rather than obtaining it for law enforcement efforts. Maj. op. at 1186.
The majority errs by relying on this claimed distinction. In Lankford, for example, we determined that the thrust of Ms. Lankford’s claim was that the defendant had “seized and reviewed her private medical records.” 27 F.3d at 479 (emphasis added). That the cases protect the individual from having his private medical records “seized and reviewed” — and not just from having those records publicly disclosed — is only reasonable because, after all, what is at stake here is intimately personal information. I think most Americans would not be comforted to think that the police could freely peruse their most private medical files so long as they did not pass the information along to the general public. Thus, I think the majority is quite wrong to attempt to distinguish Lankford and similar precedents on this basis.
Nor am I convinced that the qualified immunity defense should prevail here on the ground that Sheriff White sought the information for law enforcement purposes. An objectively reasonable law enforcement officer must know that not all methods are open to him in pursuing his legitimate law enforcement interests. Sheriff White had fair notice that constitutional protections afforded to individuals’ private medical records restrict the ambit of police actions. Nonetheless, Sheriff White proceeded as if Jason Kerns’s medical records were entirely unprotected.
As noted, Plaintiff Jason Kerns bases his section 1983 claim against Sheriff White on both the Fourth and the Fourteenth Amendments to the Constitution. Because Jason Kerns enjoyed a due process right to the non-disclosure of his personal medical information, the infringement of that right implicates the Fourth Amendment. See, e.g., Douglas v. Dobbs, 419 F.3d 1097, 1103-04 (10th Cir.2005) (Tymkovich, J., concurring). In the Fourth Amendment context, Plaintiff relies heavily on Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). The majority attempts to confine Ferguson to very narrow contours, and its characterization of Ferguson is unduly limiting. Ferguson did note that in some circumstances statutes may require medical providers to release information from their patients’ files. Neither the majority nor Sheriff White identifies any such statute which applies in this case. The district court nevertheless considered whether the VA hospital might have been authorized to release Plaintiffs records under the law enforcement exception to the Health Insurance Portability and Accountability Act, Pub.L. 104-191 (HIPAA). The district judge concluded that the law enforcement exception did not apply to the Sheriffs request, 707 F.Supp.2d at 1259, and I agree. The absence of statutory authority in this case leaves Jason Kerns’s privacy expectation undiminished and underscores the unlawfulness of Sheriff White’s conduct.
*1201 Thus the majority’s treatment of Ferguson does not withstand scrutiny. Ferguson reinforced the principle that the Fourth Amendment does protect patient records from warrantless searches without probable cause or other justification. Ferguson simply added to the existing body of law which constitutes fair warning that a law enforcement officer seeking to obtain constitutionally protected medical records must comply with the Fourth Amendment. “[A] general constitutional rule that has already been established can ‘apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.’ ” Anderson v. Blake, 469 F.3d 910, 917 (10th Cir.2006) (quoting Hope v. Pelzer, 536 U.S. at 741, 122 S.Ct. 2508).
Sheriff White points out that he asked the VA to provide the records to him, presumably instead of going into the VA’s files and taking the records himself. This is a distinction without a difference. The Supreme Court long ago established that the police cannot breach one’s constitutional rights simply by asking another person to do it for them. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). On the record before us, the VA hospital lacked any authority — apparent, express, or implied — to waive Mr. Kerns’s constitutional right to privacy in his medical records. Sheriff White’s liability is not absolved by asking an unauthorized individual to disclose the protected records instead of procuring the records himself. Sheriff Wdiite was on notice that medical records are private and that the Constitution constrains law enforcement efforts to acquire such information. As Thomas Jefferson asserted long ago: “In questions of power, then, let no more be said of confidence in man, but bind him down from mischief by the chains of the Constitution.” [17]
In sum, Sheriff White is not entitled to immunity from responsibility for his actions. I respectfully but most emphatically dissent from the majority’s reversal of the district court’s proper denial of Sheriff White’s motion for summary judgment.
C
Deputies Lindley and Koren are appellants in No. 10-2103 along with Sheriff White. The issues raised by them, and the factual background for those issues, have almost nothing in common with the issues raised by Sheriff White. Instead, Deputies Lindley and Koren, like the appellant in No. 10-2106, Mr. Haag, are sued for false arrest and false imprisonment based on their participation in the investigation that culminated in the arrest of Jason Kerns and his detention for almost nine months before the charges against him were dropped because of insufficient evidence. For convenience, I will address the appeal of Deputies Lindley and Koren in the next section, along with the appeal by Mr. Haag.
III. Appeal No. 10-2106
This appeal is brought by Mr. Michael Haag, a ballistics expert who participated in the investigation and testified before the federal grand jury that indicted Plaintiff Jason Kerns. As just noted, I will also discuss here the appeal by Deputies Lindley and Koren, who are actually appellants in No. 10-2103.
*1202 A
As to Deputies Lindley and Koren, the majority opinion provides a sketch of some of the relevant facts.[18] I will mention some of the other evidence that was presented to the district court and relied upon to support that court’s rulings.
As to Deputy Koren, his role in the investigation included trying to determine the location of the shooter when the helicopter went down. To do that, Deputy Koren tried to determine the altitude of the helicopter at the time it had been hit and the direction that the helicopter had been facing. Then he attempted to ascertain the trajectory of the bullet. Koren attempted to determine the trajectory by drawing a line between the point where the bullet entered the helicopter and one of the aircraft’s foot pedals, which had also been hit by the bullet. Koren did not, however, know how the pedals had been positioned at the time. It appears that the pilot was unavailable to assist in the first stages of the investigation, presumably as a result of his hospitalization for treatment of injuries he sustained from bullet fragments and from the crash landing. In any event, Koren simply assumed, or guessed, that the pedals had been in the “neutral” position and based his trajectory analysis on that guess, which turned out to be wrong. Koren’s conclusion was that the rifle shot had come from approximately 1630 feet, as measured on the ground. Later analysis by Mr. Welch, an expert retained by Jason Kerns, used information from the pilot as the basis for the position of the foot pedals at the time the helicopter was shot and led to the conclusion that the shot had come from a distance of about 939 feet. The district judge held that a jury could find that Koren had been reckless in his trajectory analysis.
Jason Kerns also submitted evidence to show that the GPS data recovered from the crashed helicopter showed that it had not been facing the Kerns’s residence at the time it was shot down, a fact that he alleged had been recklessly omitted from the affidavit in support of the arrest warrant. This fact is significant because the rifle shot entered the helicopter from the front, and almost directly from the front it appears. If the helicopter were not facing the Kerns’s property, then the information in the affidavit that tended to incriminate Jason Kerns based on the trajectory analysis added nothing to the probable cause analysis.
Deputy Lindley was responsible for gathering information from others involved in the investigation and for drafting the affidavit in support of the application for an arrest warrant. The district judge held that a jury could find that Lindley had been reckless in his “adoption of the most favorable of Haag’s conclusions” (which are discussed below), based on the fact that Lindley had omitted statements by Haag that would have limited the conclusions Haag had reached. For example, in relating Haag’s (erroneous) conclusion that the bullet fragments recovered from the helicopter could have been fired from one of Jason Kerns’s rifles, Lindley omitted Haag’s statement that the bullet could also have come from any of a number of other makes of rifles available on the market. Moreover, as discussed infra, Haag’s analysis was shown to have been unreasonable, and Haag himself withdrew his opinion upon reviewing the opinions of Plaintiff Jason Kerns’s expert, Mr. Welch.
As the majority correctly notes, when false statements have been included in an arrest warrant affidavit due to reckless *1203 ness or malice, our task is to determine whether the remaining facts in the affidavit are sufficient to establish probable cause. Maj. op. at 1187. And when facts have been improperly omitted from an arrest warrant affidavit, we include those omitted facts in making the probable cause determination. Id. The district court recognized these principles in its analysis, and in my view reached the correct conclusion that probable cause was not established for the arrest of Jason Kerns.
The arrest warrant affidavit is based on the theory that Jason Kerns shot down the helicopter from a location within a few feet of his parents’ property line. There is simply no other reason for including the flawed analysis which estimated that the shot had been fired from about 1630 feet away, while the helicopter at the time had been about 1670 feet from the Kerns’s home. But if the affidavit had said that the helicopter had been facing away from the Kerns’s home when it was hit in the front, the distance from the Kerns’s home would have been irrelevant. And if the affidavit had disclosed that the trajectory analysis had been based merely on Koren’s guess as to the position of the foot pedals at the time the bullet entered the aircraft, that analysis would lack probative value as well.
Thus the hypothetical affidavit that results from our omitting wrongfully ineluded information and including wrongfully omitted information is self-contradictory. I would hold that such a hypothetical affidavit would be insufficient to establish probable cause.
Even the incident in which Jason Kerns tried to elude surveillance, while probative, deserves little weight in light of the fact that the affidavit reflects that the officers were in an unmarked vehicle. Trying to evade an unmarked police car is not, I think, as indicative of guilt as trying to avoid a uniformed officer or a marked car.[19]
Further, as we consider Deputy Lindley’s role, we must consider additional information that was wrongly omitted from the affidavit.[20] This includes the fact that Mr. Haag’s ballistic analysis, flawed as it was, had concluded that the bullet fragments recovered from the helicopter could have been fired from one of Jason Kerns’s rifles or from any of a number of other rifles readily available on the market.[21] Because I conclude (in considering Deputy Koren’s appeal) that probable cause is not shown even before adding this omitted information, I certainly would hold that Deputy Lindley cannot show that probable cause was established in spite of his errors, including the omission of Mr. Haag’s statement about the number of rifles on the market that could have fired the shot.
*1204 Therefore, I would affirm the district court’s denial of qualified immunity to Deputy Lindley and Deputy Koren.
B
Mr. Haag is a civilian employee of the City of Albuquerque who works in the firearm and toolmark unit of the city’s forensic science center. Mr. Haag is a respected member of a national professional group, the Association of Firearms and Toolmark Examiners (AFTE). Under the group’s standards for ballistics examinations, there are four conclusions that can be reached: (1) identification, (2) inconclusive, (3) elimination, and (4) unsuitable. “Identification” is a conclusion that the tested bullet fragment, for example, matches the characteristics of the weapon under consideration. In this case, Mr Haag concluded that the shell casing wrapped in tape that had been found in the trash at the Kerns’s residence was identified as having come from Jason Kerns’s FN rifle.[22]
“Inconclusive” means that the examiner can neither identify the fragment as being from the subject gun nor can he exclude the possibility that it was. Mr. Haag concluded that the fragments he examined that had been taken from the helicopter and from the pilot’s leg could neither be identified nor excluded as having come from the FN rifle. His conclusion was, therefore, “inconclusive.” Mr. Haag advised Deputy Lindley of this conclusion and also testified to the grand jury about it. Mr. Haag opined in his report and his grand jury testimony that the bullet fragments could have come from the FN rifle as well as from many other firearms available on the market.
Plaintiff Jason Kerns retained his own ballistics expert, Mr. Welch. Mr. Welch testified that, upon using a microscope to compare the first bullet fragment to a bullet that had been test-fired from Plaintiffs FN rifle, the first step of his analysis, it took him only five seconds to conclude that the FN rifle should have been eliminated as the source of the fragments that had been recovered from the crash. Mr. Welch testified that Mr. Haag was recognized in the field as a competent examiner and that he, Welch, personally had reviewed some of Mr. Haag’s work before and had never disagreed before with one of Mr. Haag’s conclusions. In this case, however, Mr. Welch testified that he could not comprehend how Haag had reached a different conclusion: “It just boggles my mind.” The two examined projectiles were “grossly different.” Welch opined that it was “reckless disregard of the facts” for Haag to disregard the gross discrepancies between the fragments recovered from the helicopter and the bullet that had been test-fired from the FN rifle.
The district judge, taking the evidence in the light most favorable to Jason Kerns as the non-movant, held that a reasonable jury could find that Mr. Haag’s decision not to exclude the FN rifle “rose to the level of reckless disregard.” 707 F.Supp.2d at 1279. The judge further held that a reasonable jury could also find “intent.” Id.
Before proceeding to the probable cause analysis that we must undertake on the assumption that the affidavit should have declared that the FN rifle had been eliminated, I mention one further point on which I disagree with the majority. This *1205 has to do with the tape-wrapped shell casing that had been found in the Kerns’s trash. Mr. Haag had concluded that this shell casing had been fired from the FN rifle, and that conclusion has never been questioned. The majority says that this bit of evidence helps to support a determination of probable cause — even when considered with the fact that the ' affidavit should have reflected that the FN rifle had been excluded — because it supposedly showed that Jason Kerns had something to hide. This is singularly unpersuasive to me. No motive for hiding an object that could not have been incriminating is suggested.
What is left in the arrest affidavit after omitting the faulty ballistics analysis is, in my view, inadequate to establish probable cause even if sufficient to have aroused the officers’ suspicion. The affidavit for arrest warrant reflects that Jason Kerns rushed to the scene of the crash and offered his observations. The affidavit reflects that several other witnesses also said that they had heard a gunshot, and a fair inference is that their information, like Mr. Kerns’s, was not sufficiently accurate to permit the investigators to determine the location of the shooter. Even the incident in which Kerns tried to elude surveillance, while probative, is not of much weight, as I have noted supra. Therefore, I believe that the majority errs when it concludes that it would not have made a difference if Mr. Haag had excluded the FN rifle. I acknowledge that the affidavit contains some inculpatory material and those facts would have justified farther investigation of Jason Kerns. But I do not agree that such material established probable cause for his arrest.
A law enforcement expert may not take reckless liberties with the truth or lie in-
tentionally and be immune from the consequences. Pierce v. Gilchrist, 359 F.3d 1279 (10th Cir.2004). Qualified immunity does not protect the dishonest state actor. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (“[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.”).
In sum, then, I conclude that the arrest and prosecution of Jason Kerns would not have been supported by probable cause absent the faulty analysis by Mr. Haag. We lack jurisdiction to review the district court’s holding that a reasonable jury could find that Mr. Haag’s errors were the result of reckless disregard for the truth. If a jury were to make that finding, it would be justified under Pierce v. Gilchrist in holding Mr. Haag liable for his conduct. Therefore, I would affirm the district court’s denial of immunity to Mr. Haag.

Conclusion

Accordingly, I respectfully dissent.[23]

. The existence vel non of exigent circumstances is a mixed question of fact and law. See United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir.1992). The ultimate question whether the facts as found by the jury meet the legal standard of exigency is a question of law. Id.

. The primary focus of the Officers' argument both in the district court and on appeal is that *1192 their conduct was lawful under the recognized exigent circumstances exception to the Fourth Amendment.

.Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

. Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).

. United States v. Najar, 451 F.3d 710, 717 (10th Cir.2006).

. Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.2004).

. References in this dissent to “Jason Kerns's records” are made merely for convenience, not to address the irrelevant question of whose property interests are involved. This ease is not about title to personal property but about the constitutionally privileged information contained in the records. Thus, I use the phrase “Jason Kerns’s records” as an abbreviated reference to the protected information contained in those records.

. This part of the investigation clearly was not directly relevant to the helicopter crash under investigation. Instead, it was an effort to determine whether a different offense had been committed. While I do not question that such an inquiry is legitimate police work, if properly undertaken, in the context of a warrantless search it is relevant to the constitutional analysis whether law enforcement’s need for the information was urgent.

. Sheriff White argued unsuccessfully in the district court that his quest for Jason's medical records was supported by probable cause. On appeal, he does not repeat that argument, nor does he even assert that the quest was supported by reasonable suspicion. I conclude therefore that at this stage of the litigation, we must assume that the quest was based on nothing more than speculation.

. The VA records yielded no indication that either had occurred.

. A presumption of confidentiality was reasonable and in accord with traditional professional restrictions. A modern version of the ancient Hippocratic Oath states the physician’s duty of confidentiality in these terms: “I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know.” Peter Tyson, The Hippocratic Oath Today, Public Broadcasting Service, http://www.pbs.org/wgbh/novaAjody/ hippocratic-oath-today.html (March 27, 2001).

. The Sheriffs letter requested the VA to produce "any and all records” relevant to Jason Kerns’s psychiatric condition. (Emphasis added.)

. See n. 9, supra.

. Maj. op. at 1184. The majority seems almost reluctant to accept that Mr. Kerns has a privacy right. This is odd because this is a principle that several of our cases have recognized, see, e.g., A.L.A. v. West Valley City, 26 F.3d 989, 990-91 (10th Cir.1994) ("There is no dispute that confidential medical information is entitled to constitutional privacy protection.”), and is not contested by the Sheriff in this litigation.

. In Douglas, law enforcement had acted on information that the plaintiff's physician suspected plaintiff was forging prescriptions. Moreover, we noted that law enforcement was acting under the authority of a state statute. Id. at 1102 n. 3.

. Given that Douglas twice cites a state statute that appears to authorize the conduct of law enforcement there, I do not understand the majority’s description of the dictum as addressing the necessity vel non of a warrant "in the absence of such a statute.... ”

. 4 Debates in the Several State Conventions, on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787 540, 543 (Jonathan Elliot, 2d ed. 1891) (reprinting the Kentucky Resolutions of 1798 and listing Thomas Jefferson as author of the draft resolutions).

. As with every other aspect of these appeals, the facts are set out in much greater detail in the district judge's very thorough opinion published at 707 F.Supp.2d 1190.

. Our analysis must be limited to the facts recited in the affidavit for the arrest warrant, as the majority apparently recognizes in its general description of its approach on appeal. Maj. op. at 1186. The majority thus errs by relying on Jason Kerns’s later admission that he believed the car following him was probably a police car, a fact that was disclosed in discovery in this case and was not mentioned in the affidavit.

. Throughout this discussion I refer to wrongly included or wrongfully excluded information. A jury could determine, as the district judge correctly noted, that the errors of Lindley and Koren were due to mere negligence, not to recklessness or intent to deceive. For our purposes, however, we consider only the legal consequences of a possible jury determination that the deputies' conduct was reckless or worse.

.I believe that Deputy Lindley was entitled to rely on Mr. Haag’s analysis, although of course he was not entitled to distort it. Thus although as explained infra we must, in considering Mr. Haag’s appeal, assume that Jason Kerns’s rifle had been conclusively excluded, the reasons for that treatment do not apply to Deputy Lindley.

. Mr. Haag had determined from trace evidence he observed in the helicopter that only a high-powered rifle could have fired the shot. In the search of the Kerns's residence, officers had recovered three high-powered rifles. Mr. Haag quickly eliminated two of them and thereafter focused on the rifle that is referred to herein as the FN rifle.

. A number of issues raised by the parties were not reached in the majority opinion because the majority’s disposition effectively mooted them. I have not attempted in this dissent to reach every such issue.