IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 6, 2019 Session

## STATE OF TENNESSEE v. GREG PATTERSON

**Appeal from the Circuit Court for Lauderdale County**
**No. 10466     Joseph H. Walker III, Judge**

_____

### No. W2018-01799-CCA-R3-CD
_____

The Defendant, Greg Patterson, was involved in dependent and neglect proceedings in juvenile court and tested positive for methamphetamine in a drug screen ordered by that court.  He was, thereafter, charged with attempted aggravated child neglect for exposing his two-year-old child to methamphetamine.  The trial court denied the Defendant's pretrial motion to suppress the drug screen results, and a jury ultimately convicted the Defendant as charged.  On appeal, the Defendant submits that the trial court erred by denying his suppression motion because he did not voluntarily consent to a search and, moreover, because the special needs exception to the warrant requirement does not apply.  Following our review, we conclude that the search was constitutionally reasonable as a special needs exception.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Julie K. Pillow, Assistant District Attorney General, for the appellant, State of Tennessee.

Jason R. Creasy, Dyersburg, Tennessee, for the appellee, Greg Patterson.

### OPINION
FACTUAL BACKGROUND

The Defendant was ordered by a juvenile court judge to undergo hair-follicle drug screening during dependent and neglect proceedings concerning the Defendant's two-year child.  Following his positive result, the Lauderdale County Grand Jury, on October 2, 2017, charged the Defendant with attempted aggravated child neglect for exposing his

child to methamphetamine, a Class B felony.  See Tenn. Code Ann. §§ 39-12-101, -15-402.

Prior to trial, the Defendant filed a motion to suppress the "results of [the] drug screen" that was ordered in juvenile court, alleging that the search violated the Fourth Amendment to the United States Constitution.  The Defendant maintained that he did not voluntarily consent to the search, noting that he "was not advised of his constitutional rights[,] including self-incrimination[,] prior to" being required to submit to drug screening.  The State filed a response, asserting first that the Defendant provided valid consent to search by appearing at the drug-screening center, "signing the disclosure form," and "submitting to the test."  The State also indicated that the Defendant had no expectation of privacy because he "was well aware of the nature of [the juvenile] proceedings with regard to the neglect of his child" and that his drug screen results were to be provided to the juvenile court and used to determine the outcome of those proceedings.  Alternatively, the State maintained that the search fell within the "special needs" exception to the warrant requirement due to the fact it was ordered by a juvenile court judge in relation to a dependent and neglect petition that had been filed against the Defendant on behalf of his two-year-old child.  The State noted that the juvenile court had the "responsibility of protecting" the children of Tennessee and that in this case, "there was a legitimate suspicion that the parents were using drugs and that the child[] had been drug exposed as a result."  The State concluded that under these circumstances, "the safety interests outweighed the privacy interests of the individual."

A hearing was held on January 25, 2018, where the following evidence was adduced.[1]    The Lauderdale County Juvenile Court Administrator, Kim Coffee, was called to testify and confirmed that Officer Dennis Hardee[2] filed a dependent and neglect petition with the juvenile court on June 12, 2017, concerning the Defendant, the Defendant's two-year-old[3] child ("J.P."),[4] and the child's mother.  The petition also

---

[1] We note that the actual exhibits from the hearing were not presented or certified to this court.  However, the transcript clearly described each exhibit before said piece of evidence was entered into evidence.  In addition, all of the exhibits were attached to the State's response to the Defendant's motion to suppress and, thus, are a part of the technical record on appeal.  Although this is not the proper way to certify exhibits to the appellate court, we will rely on them in issuing our opinion because it is clear that these were the exhibits entered into evidence at the suppression hearing.

[2] The transcript spells the officer's last name as Hardy, but the documents in the record reflect the spelling as Hardee.  Because the officer himself assisted in preparation of the dependent and neglect petition, we will use the spelling contained therein.

[3] Although all references were to this child being two years of age, including her age listed on the petition itself, it appears that she was in fact only one year of age at the time the petition was filed based upon her birthdate provided therein.

involved an older child of the mother's, nine-year-old M.M., who lived with the couple; M.M. was fathered by another man, F.J. Specifically, with regard to Officer Hardee's employment, Ms. Coffee stated that he "work[ed] for [her]" as an investigator for the Lauderdale County Juvenile Court, though, she also agreed that he was "actually a police officer[.]"

Ms. Coffee indicated that Officer Hardee's affidavit in the petition was "pretty lengthy." Officer Hardee's affidavit reads, in pertinent part, as follows:

> [S]aid children are dependent and neglected in that the children's mother . . . admitted that she and the [Defendant] have drug addictions including methamphetamine and have used methamphetamine in a bathroom of the home and the shop behind the home of [the Defendant]. The [Defendant] has punched the mother in the face, breaking her jaw, and knocking her to the ground while she was holding [J.P.] The mother states that she lied when she received medical treatment and stated that she fell. On September 15, 2016, the mother reports that [the Defendant] blacked her eye and left bruises all over her body. She states that she has been slapped, bitten and spit on by [the Defendant]. The mother has filed two Orders of Protection against the [Defendant] in the past but has dropped both. The [Defendant] is currently on parole[5] on drug charges and the mother reports that he was fired from MidSouth Suppliers after wrecking a work vehicle and failing a drug screen. The mother was fired from her job at O'Reilly's recently for refusing to take a drug screen. The [paternal] grandmother, [T.P.], resides in the home with the parents and the [children], and she has been incarcerated in the Lauderdale County Jail for Vandalism and Resisting Arrest involving the mother . . . . [The Defendant] insists that [T.P] is too mentally unstable to live on her o[w]n. [The Defendant and T.P.] fight each other, and [T.P.] has threatened the mother in front of [M.M.] [The Defendant] has hit himself in the face repeatedly, outraged because he thought the mother was lying to him. The mother reports that she has seen the [Defendant] sell drugs outside their home and also done drugs with people at their shop. [T.P.] has also threatened to kill herself on multiple occasions. [The Defendant and T.P.] both have threatened to kill the mother. There are voice recorders hidden around the home and cameras on the outside of the home. The mother contacted [M.M.'s] father, [F.J.],

---

[4] It is the policy of this court to refer to minors by their initials. To protect the minors' privacy, we will also refer to family members by their initials.

[5] Based upon the testimony at trial and the judgment form, it appears that the Defendant was on probation, not parole.

on Saturday, stating that she needed help for her drug addiction and she wanted [M.M.] to stay with him. The mother stated that she was going to be admitted into Lakeside. However, she feared for the safety of her youngest child, [J.P.,] and therefore, only agreed to do outpatient treatment three days per week. Today, the mother is going to check herself into Lakeside for inpatient treatment and stated the [Defendant] needs to do the same.

Ms. Coffee explained that, generally, after a dependent and neglect petition was filed with the juvenile court, the juvenile court judge reviewed the petition and decided whether emergency removal of the child(ren) was necessary. In this case, the juvenile court judge entered an order on the same day the petition was filed, June 12, 2017, and placed the minor children in protective custody. Specifically, the juvenile court judge determined that there was probable cause to believe the children were dependent and neglected within the meaning of the law; that the children were subjected to an immediate threat to their health and safety to the extent that delay for a hearing would likely result in severe or irreparable harm; that there was no less drastic alternative to removal available that would reasonably and adequately protect the children's health and safety pending a preliminary hearing; and that it was contrary to the children's welfare at that time to remain in the care, custody, or control of the Defendant and their mother. In so concluding, the juvenile court judge cited to the detailed facts set forth in Officer Hardee's affidavit.

Following a June 15, 2017 hearing, the juvenile court judge issued a written "Order on Preliminary Hearing." Ms. Coffee acknowledged that this was not "a consent" order. Initially, it was stated in the order that all concerned parties had agreed "to pass" the preliminary hearing until July 6, 2017, although the hearing was originally scheduled for that day, June 15, 2017. Ms. Coffee affirmed that a preliminary hearing was the proceeding where the juvenile court judge would determine if there was probable cause to move forward on the dependent and neglect petition; accordingly, Ms. Coffee agreed that no probable cause determination had been made at the time the June 19, 2017 order was entered. The juvenile court order further reflected that the Defendant, the children's mother, and both children were to "have a hair-follicle test[,] or in the case of [the Defendant] a nail clipping if insufficient hair[,] within four hours after court" adjourned. Ms. Coffee recalled that the Defendant requested F.J. also be tested, so the juvenile court judge ordered that F.J. submit to a hair-follicle drug screen if paid for by the Defendant by 2 p.m. that day.

Ms. Coffee then reviewed two documents signed by the Defendant when he presented at the drug-screening center, RapidCare. The first one was a document signed by the Defendant authorizing RapidCare to disclose "protected health information to [his]

employer." On this form, RapidCare was self-described as a twenty-four-hour "occupational healthcare service" or "primary/urgent care clinic." The second document was a form signed by the Defendant at 2:45 p.m. on June 15, 2017,[6] confirming that a hair-follicle sample would be collected and that the sample would be screened by a "ten-drug-panel" test. Ms. Coffee agreed that the juvenile court received the results of the various drug screens preformed on the individuals involved in this case and that the results of the Defendant's specimen revealed the presence of 3,660 pg/mg amphetamine and 14,618 pg/mg methamphetamine. Ms. Coffee further confirmed that J.P.'s hair-follicle "ten-drug-panel" screen performed at 3:04 p.m. on June 15, 2017, showed the presence of 229 pg/mg amphetamine and 1,649 pg/mg methamphetamine in her specimen.

Officer Hardee also testified at the suppression hearing that he was "an investigator" for the Lauderdale County Juvenile Court and that he had been employed with the Lauderdale County Sheriff's Department since 2006 in various positions. Officer Hardee confirmed that after speaking with the children's mother in this case, he filed a dependent and neglect petition. He indicated that the mother gave a three- to five-page statement detailing the things occurring in the home. Officer Hardee indicated that he did not conduct any further investigation at that time outside of taking the mother's statement. Officer Hardee agreed that he included this information in the affidavit to the petition and that he signed said petition affirming that the details contained therein were true and correct.

Officer Hardee relayed that the mother declined a drug test on June 12, 2017, the day the petition was filed, because she was confident it would yield positive results. Officer Hardee also went to the Defendant that day to make him "aware of the petition." At that time, Officer Hardee conveyed to the Defendant that he could take a drug test if he was so inclined, but the Defendant refused. According to Officer Hardee, "[t]here was no active criminal investigation at that point in time[.]" Officer Hardee affirmed, though, that following the dependent and neglect proceedings in juvenile court, he forwarded the file, including the drug screen results, to the district attorney's office. When the Defendant's case was taken before the grand jury, Officer Hardee was "the presenting officer" whose testimony resulted in the Defendant's being indicted.

On cross-examination, Officer Hardee indicated that at the time he filed the dependent and neglect petition, he did not have enough information to obtain a search warrant for a drug-screening specimen from the Defendant. He confirmed that he could not file criminal charges against the Defendant based solely on the statement of the

---

[6] The Defendant incorrectly dated the document June 13, 2017. However, it is clear from the record that the correct date was June 15, 2017.

mother, an admitted methamphetamine user. In addition, Officer Hardee did not recall a probable cause determination ever taking place in juvenile court.

On recross examination, Officer Hardee stated that he neither personally obtained the hair-follicle sample from the Defendant nor escorted the Defendant to the drug-screening center. Officer Hardee affirmed that the Defendant presented at RapidCare "of his own volition[.]"

Thereafter, the trial court entered a written order denying the Defendant's suppression motion. The trial court initially recounted the juvenile court's protective custody order of June 12, 2017, included findings therein by the juvenile court that there was probable cause to believe that J.P. was a dependent and neglected child and that J.P. was subjected to an immediate threat. The trial court indicated that the juvenile court relied on the statement of the mother, which was a statement against penal interest, in rendering its findings. The trial court referenced a portion of the order recounting the mother's statement that she and the Defendant had drug addictions and used methamphetamine in their home.

Based upon these facts, the trial court concluded that "[t]he juvenile court made a probable cause determination" in the June 12, 2017 protective custody order, "and[,] therefore[,] it was lawful to order the [D]efendant to submit a hair sample for a drug test." The trial court continued, "It was not necessary to re-state the probable cause in the order of June 15." According to the trial court, in spite of the fact that "[t]here was no search warrant issued, . . . the warrantless search [of the Defendant] was not unreasonable based on the facts that were before the juvenile court judge." The trial court indicated that "[t]here was specific individualized suspicion that methamphetamine was in the environment where the two-year-old child was living." The trial court further reasoned, "Here the concern was on dependency and neglect of a two-year old due to the drug use of her parents, and the need to obtain information about the parent's behavior was increased, and the requested drug testing was not unconstitutional."

The trial court next addressed a Utah Supreme Court case, State v. Moreno, 203 P.3.d 1000 (Utah 2009), because it was cited by both parties at the suppression hearing. The trial court distinguished Moreno, reasoning that the Moreno case dealt with a delinquent child rather than a dependent and neglect proceeding. The trial court noted that in that case, the parent was ordered "to take a drug test, which was deemed unconstitutional because the focus of the court was on modifying the behavior of the juvenile." However, where, as here, according to the trial court, the focus was on protecting children and concern for their welfare, the "parent has a much less expectation of privacy." The trial court then cited the following language from Moreno: "In the presence of a welfare concern related to the parent's drug use, the government's interest is decidedly increased, as are the possible consequences of waiting until there is a

-6-

probable cause for a search." 203 P.3.d at 1011. Thus, according to the trial court, the Moreno court implied that "even without probable cause, requiring a drug test of a parent could be permissible where the focus is protecting a child." However, the trial court reiterated that in the Defendant's case, "there was probable cause."

Alternatively, the trial court found that the Defendant gave voluntary consent to drug screening. The trial court explained, "The [D]efendant submitted to the collection of hair in an effort to maintain custody of the child. He was not forced to go to the clinic for the hair sample but did so, and voluntarily signed the forms." The trial court continued that "[w]hile the [D]efendant . . . was ordered to take a drug test for the dependent and neglect hearing, the failure to do so would have resulted in custody or visitation issues" and not criminal proceedings. In addition, the trial court concluded that it was not required the Defendant be "advised of his rights," specifically the right to refuse, before consenting to the drug screen.

Thereafter, the Defendant proceeded to a jury trial and was convicted as charged. The trial court sentenced the Defendant as a Range I, standard offender to eight years of split confinement, with service of six months' incarceration to be followed by community corrections. The special conditions section of the judgment form indicated that the Defendant was on six years' probation for a prior methamphetamine conviction at the time he committed this offense, that the Defendant admitted he had suffered from an addiction to methamphetamine for over twelve years, and that the Defendant was to be granted furlough to receive drug rehabilitation treatment.

After the denial of the Defendant's motion for new trial, wherein the Defendant raised the suppression issue, he filed a timely appeal. The case is now before us for our review.

ANALYSIS

On appeal, the Defendant argues that the trial court erred in denying the suppression motion because the hair-follicle search was conducted without a warrant and none of the recognized exceptions to the warrant requirement apply to the drug screening in this case. Specifically, the Defendant contends that he did not give valid consent: "Being compelled by a court order to submit to a hair-follicle drug screen cannot and is not uncontaminated by duress or coercion and is not the product of a free and unconstrained choice." Addressing the State's argument regarding the "special needs" exception, the Defendant responds that it does not validate the search in this case because a law enforcement officer filed the petition against the Defendant and received the drug test results, and he cites Ferguson v. City of Charleston, 532 U.S. 67 (2001), in support.

The State responds that the trial court properly denied the Defendant's motion. The State's argument is three-fold: (1) The search was reasonable because "[o]rdering drug testing during dependency and neglect juvenile court proceedings falls within the special needs exception to the warrant requirement"; (2) regardless, if there was a violation of the Defendant's Fourth Amendment rights, "suppression is not the appropriate remedy because the sole purpose of the suppression doctrine is to deter future unlawful police conduct," which is not present here; and (3) finally, "even if there were an unreasonable search, and even if suppression were appropriate, any such error was harmless beyond a reasonable doubt because the test was merely superfluous to [the mother's] testimony" at trial.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law, along with its application of the law to the facts, are reviewed de novo without any presumption of correctness. Id.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). The search and seizure provisions of the federal and state constitutions are "identical in intent and purpose." State v. Christensen, 517 S.W.3d 60, 68 (Tenn. 2017) (quoting Sneed v. State, 423 S.W.2d 857, 860 (1968)). "Under both constitutional guarantees, reasonableness is 'the ultimate touchstone.'" State v. Stanfield, 554 S.W.3d 1, 9 (Tenn. 2018) (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006); State v. McCormick, 494 S.W.3d 673, 679 (Tenn. 2016)). Whether a particular search meets the reasonableness standard "is judged by balancing its intrusion on the individual's . . . interests against its promotion of legitimate governmental interests.'" Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 619 (1989) (quoting Delaware v. Prouse, 440 U.S. 648, 654 (1979)).

A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. Chandler v. Miller, 520 U.S. 305, 308 (1997). Determining whether a particular search is "unreasonable" and, therefore, a violation of the rights guaranteed by the Fourth Amendment "depends upon all of the circumstances

surrounding the search . . . and the nature of the search . . . itself." State v. Turner, 297 S.W.3d 155, 160 (Tenn. 2009) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)). "While a search is presumptively reasonable when conducted on the basis of probable cause and with a warrant, warrantless searches and seizures are presumptively unreasonable regardless of whether law enforcement actually had probable cause to conduct a search." State v. Hamm, 589 S.W.3d 765, 771 (Tenn. 2019) (citing McCormick, 494 S.W.3d at 678-79). This is merely a presumption, however, and there are several exceptions to the probable cause and warrant requirements, including investigatory detentions, searches incident to a valid arrest, seizure of items in plain view, exigent circumstances, consent searches, vehicle searches, container searches, and searches in which the special needs of law enforcement make the probable cause requirement impracticable. Tamez v. City of San Marcos, 118 F.3d 1085, 1093 (5th Cir. 1997) (citing David Orlin, et al., Warrantless Searches and Seizures, 85 Geo. L.J. 847, 847 (1997) (collecting cases)).

At the outset, we will quickly dispense with any consent argument. Initially, we note that the State has seemingly abandoned the argument on appeal that the Defendant provided valid consent to search. Moreover, we also agree with the Defendant that any such argument is without merit because the Defendant was compelled by the juvenile court's order to submit to a drug screen. Officer Hardee testified at the suppression hearing that he had previously informed the Defendant of the dependent and neglect petition and that the Defendant was offered a voluntary drug screen at that time, but the Defendant refused. The Defendant only submitted to drug screening after being ordered by the court to do so. The RapidCare consent form he signed was a release of "protected health information to [his] employer"; the other RapidCare form was merely his assent to the procedures to be performed.

In addition, the State failed to present any evidence at the suppression hearing that the Defendant was given the option to refuse the drug screen simply by termination of his parental rights. Accordingly, the State's argument in the trial court that if the Defendant refused, then he would only have visitation or custody issues, not criminal problems, does not hold weight. The Defendant would be faced with criminal contempt if he failed to appear at the drug-screening center for testing regardless of whether any criminal charges were ever brought against him. Criminal contempt "is punishment for failing to comply with an order." Sherrod v. Wix, 849 S.W.2d 780, 786 n.4 (Tenn. Ct. App. 1992); see also Tenn. Code Ann. § 29-9-102. It is designed "to preserve the power and vindicate the dignity and authority of the law and the court as an organ of society." Baker v. State, 417 S.W.3d 428, 436 (Tenn. 2013) (citation omitted). Criminal contempt is often regarded as a "crime." Id. Thus, we cannot say that the Defendant's consent was the product of a free and unrestrained choice. See State v. Doe, 233 P.3d 1275, 1282 (Idaho 2010) (noting that the magistrate court's authority to issue criminal contempt sanctions against

the parents in a juvenile delinquency proceeding required "virtually all the ordinary protections" afforded by the United States Constitution) (citations omitted).

Irrespective of consent, the Tennessee Supreme Court has observed that there are limited circumstances "where the reasonableness standard of the Fourth Amendment and article I, section 7 requires neither probable cause nor a warrant." State v. Stanfield, 554 S.W.3d 1, 9 (Tenn. 2018) (citing Samson v. California, 547 U.S. 843, 846 (2006); Turner, 297 S.W.3d at 157); see also Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989) ("[N]either a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance."). For example, warrantless, suspicionless searches designed to serve "special needs, beyond the normal need for law enforcement" have been upheld as reasonable under the Fourth Amendment and article I, section 7. See, e.g., City of Indianapolis v. Edmond, 531 U.S. 32, 37-40 (2000) (collecting cases approving suspicionless searches to serve special needs); State v. Downey, 945 S.W.2d 102, 104 (Tenn. 1997) ("We, therefore, conclude that the use of a sobriety roadblock, although a seizure, can be a reasonable seizure under the Tennessee Constitution, provided it is established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene.").

The United States Supreme Court, in discussing the special needs exception to the warrant requirement, has recognized that programmatic searches performed in the absence of a warrant or individualized suspicion may be permissible "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." O'Connor v. Ortega, 480 U.S. 709, 720 (1987) (quoting New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment)). For example, the Court, in Vernonia School Dist. 47J v. Acton, held that a public-school district's student athlete drug policy, which included a random urinalysis requirement for participation in interscholastic athletics, did not violate the student's federal constitutional right to be free from unreasonable searches. 515 U.S. 646, 652-665 (1995). The Supreme Court has also determined that "suspicionless" drug testing of United States Customs Service employees "who appl[ied] for promotion to positions directly involving the interdiction of illegal drugs, or to positions that require[d] the incumbent to carry a firearm, [was] reasonable" and did not violate the Fourth Amendment. Von Raab, 489 U.S at 679. Additionally, drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations were upheld in Skinner, 489 U.S. at 618-34. The Skinner Court, in so holding, reasoned, "The [g]overnment's interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, . . .

["]presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." Id. at 621. Similarly, in the context of probation, the United States Supreme Court has held that "[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, . . . 'presents special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements." Griffin v. Wisconsin, 483 U.S. 868, 873-74 (1987) (internal quotation marks omitted).

We briefly digress to note that the United States Supreme Court has also held "that the warrantless search of [a defendant], supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." United States v. Knights, 534 U.S. 112, 114 (2001) (considering the constitutionality of a search that was premised on the probation condition requiring the defendant to "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer"). Moreover, the Tennessee Supreme Court has recently taken this a step further by holding "that probation search conditions that permit a search, without warrant, of a probationer's person, vehicle, property, or place of residence by any Probation/Parole Officer or law enforcement officer, at any time, do not require law enforcement to have reasonable suspicion." Hamm, 589 S.W.3d at 777. Such searches are still evaluated for their reasonableness under the "general Fourth Amendment approach of 'examining the totality of the circumstances,' with the probation search condition being a salient circumstance." Knights, 534 U.S. at 118 (emphasis added) (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)); see Hamm, 589 S.W.3d at 779.

Here, it was clearly established that the Defendant was on six years of probation for a methamphetamine conviction at the time he was ordered by the juvenile court judge in the dependent and neglect proceeding to submit to drug screening. While Officer Hardee's affidavit mistakenly referred to parole, the Defendant was in fact on release into the community. However, the State did not seek to justify the warrantless search by arguing that the Defendant accepted such as a condition of his probation. Moreover, neither the specific conditions of the Defendant's probation nor his consent to those conditions were ever established for the record. Because it does not appear that the Defendant's probationary status, including any possible probation search condition, was a "salient" circumstance taken into consideration by the trial court, we are precluded from addressing whether the search could be supported upon such a basis pursuant to Knights and must address the constitutional issue presented by the special needs exception.

-11-

"When such 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Chandler, 520 U.S. at 314 (citing Von Raab, 489 U.S. at 665-66, 668). As Skinner stated, "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." 489 U.S. at 624. No Tennessee court has previously addressed the specific issue presented by this case; in fact, we are unable to find a substantially similar factual scenario from any of the fifty states or the various federal courts.

The Defendant relies on Ferguson v. Charleston, 532 U.S. 67, in support of his argument that the search in this case was constitutionally impermissible. He notes that Officer Hardee, a law enforcement officer, filed the dependent and neglect petition against him in juvenile court and received the results of the Defendant's drug tests. We do not dispute that Officer Hardee was working in a law enforcement capacity or that the test results were received by Officer Hardee and the juvenile court, but this does not end the inquiry.

In Ferguson, the United States Supreme Court analyzed the constitutionality of a state hospital's policy of performing nonconsensual drug testing on pregnant women suspected of cocaine abuse. 532 U.S. at 69-70. The policy provided for a referral to substance-abuse treatment for women who tested positive and added the threat of law enforcement intervention. Id. at 72. The Supreme Court found the policy violative of the Fourth Amendment because "the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment." Id. at 80. The Supreme Court observed that the "ultimate goal" of the program, i.e., substance-abuse treatment, may have been salutary, but "the immediate objective of the searches was to generate evidence for law enforcement purposes in order to reach that goal." Id. at 82-83. Although the hospital intended that the threat of prosecution would curtail drug use, the "direct and primary purpose" of the scheme was to assist the police. Id. at 84. The Supreme Court found the distinction critical, explaining as follows: "Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose." Id.

The Supreme Court of Idaho took guidance from Ferguson in Doe, 233 P.3d 1275, in deciding that the magistrate court's order for random drug screens of the parents

-12-

constituted an illegal search and seizure. In Doe, the defendants' minor daughter appeared in magistrate court and was placed on informal probation under Idaho's Juvenile Corrections Act ("JCA") after she signed a written admission to two counts of petit theft. 233 P.3d at 1277. A social investigation revealed that the defendants had a history of drug abuse and that the mother had been on probation for possession of marijuana drug paraphernalia, so the magistrate judge ordered the defendants "to undergo random drug urinalyses as a term of their daughter's probation." Id. The father subsequently signed two written admissions to smoking marijuana on separate occasions shortly after the probation terms were imposed. Id. The mother signed a similar written admission to using marijuana. Id. Moreover, both of the defendants submitted urine samples that tested positive for tetrahydrocannabinol, the active compound in marijuana. Id.

Thereafter, the defendants' daughter was found to have violated the terms of her probation for various reasons, and she was placed on formal probation. 233 P.3d at 1277. The magistrate again required the defendants to submit to random urine testing as a term of their daughter's probation and ordered them not to violate controlled-substance laws. Id. The magistrate's order further admonished the defendants that they could be subject to criminal contempt proceedings if they disobeyed the order. Id.

On appeal, the Supreme Court of Idaho balanced the intrusion on the defendants' privacy interest against the state's legitimate interests and concluded that the magistrate's order violated the Fourth Amendment by requiring urinalysis testing as a condition of the defendants' daughter's probation. Doe, 233 P.3d at 1282. The Doe court reasoned that although "[t]he intrusion [was] not extraordinarily invasive," the defendants did "not have a diminished expectation of privacy in their bodies simply because their daughter [was] on juvenile probation." The court acknowledged the state's legitimate interest in protecting and rehabilitating children but stated that "[j]ust like the testing program in Ferguson," ordering the defendants to be drug tested under the facts presented was "characterized by a general interest in law enforcement." Id. at 1281. The court noted that the magistrate imposed the urinalysis requirement during juvenile delinquency proceedings pursuant to the JCA, which was quasi-criminal in nature; that the defendants were required to report to their daughter's probation officer; that nothing prevented the probation officer from conveying the results of the test to law enforcement, which did in fact occur; and that such evidence could be used against the defendants to obtain search warrants. Id. The court surmised that it would not uphold the search because its purpose was intended to ensure the defendants' "daughter's rehabilitation by detecting drug use at home," and because "[t]he immediate method for attaining" that goal was "to report the drug use for criminal sanctions." Id. at 1282.

A similar conclusion was reached by the Utah Supreme Court in <u>Moreno</u>, 203 P.3d 1000, as was discussed by the trial court in this case because it was cited below by both parties; the trial court's ruling is detailed above.[7] In <u>Moreno</u>, the defendant's juvenile daughter was adjudicated "delinquent for possession of marijuana and attempted possession of methamphetamine." <u>Id.</u> at 1004. As part of his daughter's delinquency adjudication, the juvenile court ordered the defendant to undergo drug testing. <u>Id.</u> When the defendant failed to appear for testing, he was charged with criminal contempt. <u>Id.</u> at 1005. The defendant appealed. Ultimately, the Utah Supreme Court weighed the privacy interest of the parent with the government's interest and concluded that the juvenile court's order violated the Fourth Amendment. <u>Id.</u> at 1008.

Like the <u>Doe</u> court, the <u>Moreno</u> court determined that the defendant enjoyed an undiminished expectation of privacy: "A parent does not surrender his expectation of privacy merely because he acquires the status of a parent of a minor who has been adjudicated delinquent." <u>Id.</u> at 1010. The <u>Moreno</u> court recognized the government's interest in ensuring "that the parent is drug free and therefore is not providing an inappropriate example to the minor or directly contributing to the minor's drug use." <u>Id.</u> at 1011. However, the court reasoned that "the behavior of parents of juveniles involved in the system [was] of secondary importance" because, in that instance, "[t]he focus of the juvenile court system . . . [was] on modifying the behavior of the juvenile." <u>Id.</u> The <u>Moreno</u> court then clarified,

> Attempting to ensure that parents of delinquent juveniles are drug free also should not be confused with the goal of protecting children where there is a concern for their welfare. <u>In the presence of a welfare concern related to the parent's drug use, the government's interest is decidedly increased, as are the possible consequences of waiting until there is probable cause for a search</u>. By contrast, where the concern of the proceeding is the child's delinquent behavior, there is less necessity to obtain information about the parent's behavior. There is time to obtain information that will provide probable cause for a search of the parent.

<u>Id.</u>

We believe the situation cited in <u>Moreno</u>, i.e., the presence of a welfare concern related to the parent's drug use, is the precise situation presented in this case. This is not

---

[7] The trial court also determined that the search was supported by the juvenile court judge's probable cause determination. The juvenile court judge found that probable cause existed to support a conclusion that the children were dependent and neglected within the meaning of the law, not that there was probable cause to believe that the Defendant's drug screen would reveal evidence of crime. Most importantly, probable cause must still be accompanied by a warrant absent an exception to the warrant requirement.

a juvenile delinquency proceeding but instead a dependent and neglect petition involving a two-year-old child and her nine-year-old sister. We do not ascertain that the immediate objective of the search was to generate evidence for law enforcement purposes, although it was a likely result. Here, the juvenile court judge determined that there was probable cause to believe that the two-year old and her older sister were dependent and neglected within the meaning of the law; that the children were subjected to an immediate threat to their health and safety to the extent that delay for a hearing would likely result in severe or irreparable harm; that there was no less drastic alternative to removal available that would reasonably and adequately protect the children's health and safety pending a preliminary hearing; and that it was contrary to the children's welfare at that time to remain in the care, custody, or control of the Defendant and their mother.

The mother reported to Officer Hardee that the children were being exposed to methamphetamine usage by both parents. The list of dangers from methamphetamine exposure and the dangerous environment surrounding its users abounds. See In re D.T., No. E2017-02098-COA-R3-PT, 2018 WL 3020327, at *5 (Tenn. Ct. App. June 18, 2018) (upholding the termination of the father's parental rights because he could not or would not ensure no-contact between the methamphetamine-addicted mother and the child, thereby, creating a persisting danger to the child). The facts surrounding the mother's reporting led to the parents having a diminished expectation of privacy in their bodies.

Regarding the level of intrusion on the Defendant's privacy interest, the Defendant reported to RapidCare, a drug-screening center that was described as twenty-four-hour "occupational healthcare service" or "primary/urgent care clinic." The testing was not performed by a government agency. Furthermore, a hair-follicle sample or nail clipping is not extraordinarily invasive when compared with urine or blood specimens. Hair and nail samples can be obtained without piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment. See Skinner, 489 U.S. at 625.

Accordingly, under the circumstances, we cannot say that significant privacy concerns are implicated. See Skinner, 489 U.S. at 626. Moreover, the welfare concern to the children in this case—that they were being exposed to methamphetamine—was paramount, and therefore, the government's interest was decidedly increased as were the possible consequences of waiting until there was probable cause for a search and a warrant could be obtained. See Moreno 203 P.3.d at 1011. Balancing the various interests at stake, we hold that the drug screening ordered by the juvenile court in this case, after a finding of probable cause to believe that the children were dependent and neglected specifically referring to the parents' methamphetamine usage, qualified for the

special needs exception to the Fourth Amendment warrant requirement, and therefore, the search was reasonable.[8]

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[8] Given that we have found the special needs exception to govern here, we decline to address the State's alternative arguments. Such would merely be dicta.